Submitted on remand from the United States Supreme Court April 21, judgment vacated in part and remanded with instructions; otherwise affirmed September 10, respondent's petition for reconsideration filed September 24 and appellants' response to petition for reconsideration filed October 8 allowed by opinion November 13, 2003
See 190 Or App 407 (2003)

Paul R. BOCCI, Jr.,
guardian ad litem for Paul R. Bocci, III,
an incapacitated individual,
*Plaintiff,*

*v.*

KEY PHARMACEUTICALS, INC.,
a foreign corporation,
Schering-Plough Corporation,
a foreign corporation,
and Schering Corporation,
a foreign corporation,
*Defendants,*

*and*

MILES, INC.,
an Indiana corporation,
Miles, Inc., Pharmaceutical Division,
an Indiana corporation,
Legacy Health System,
an Oregon corporation,
Legacy Immediate Care Clinic,
Frederick D. Edwards, M.D., and
The Eugene Clinic, a partnership,
*Defendants.*

Frederick D. EDWARDS, M.D.,
*Respondent,*

*v.*

KEY PHARMACEUTICALS, INC.,
a foreign corporation,
Schering-Plough Corporation,
a foreign corporation,
and Schering Corporation,
a foreign corporation,
*Appellants.*

A9210-07050; A86556

76 P3d 669

William F. Gary, James E. Mountain, Jr., Sharon A. Rudnick, and Harrang Long Gary Rudnick P.C. for appellants.

Daniel M. Holland, Ronald B. Terzerbach, Mary H. Spillane, Margaret A. Sundberg, and Williams, Kastner & Gibbs PLLC for respondent.

Thomas M. Christ, Cosgrave Vergeer Kester LLP; Andrew L. Frey, Even M. Tager, Miriam R. Nemetz, Mayer Brown Rowe & Maw LLP; and Robin S. Conrad, National Chamber Litigation Center, Inc., filed the brief *amicus curiae* for Chamber of Commerce of the United States of America.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

This case is before us for a third time. Defendants Key Pharmaceuticals, Inc., Schering-Plough Corporation, and Schering Corporation (collectively Key), seek a reversal of a punitive damage award entered in 1994 in favor of cross-claim plaintiff Frederick D. Edwards, M.D. (Edwards). For the reasons set forth below, we conclude that Key is entitled to a remittitur of part of the punitive damage award or to a new trial.

The pertinent facts were set forth in this court's original opinions, *Bocci v. Key Pharmaceuticals, Inc.*, 158 Or App 521, 974 P2d 758 (1999) (*Bocci I*), *vac'd and rem'd*, 332 Or 39, 22 P3d 758, *opinion on remand*, 178 Or App 42, 35 P3d 1106 (2001) (*Bocci II*). We summarized those facts in *Bocci II*:

"Plaintiff Bocci was a long-time user of defendant Key's prescription asthma medication Theo-Dur, a timed-release theophylline product. In October 1990, Bocci was prescribed the antibiotic ciprofloxacin for a skin rash, but failed to tell the prescribing physician that he was taking Theo-Dur. On October 27, 1990, Bocci went to an urgent care clinic where Edwards worked complaining of nausea, vomiting, and diarrhea. Edwards diagnosed gastroenteritis and sent Bocci home. Edwards did not diagnose theophylline toxicity, because Theo-Dur had been promoted to him as a safe drug, and he did not believe that a patient on a stable dose of the drug could develop a serious toxicity problem. Shortly after Edwards sent him home, Bocci experienced seizures and was admitted to a hospital emergency room. He was treated for theophylline toxicity. He suffered permanent brain damage from the seizures.

"Bocci sued Key and Edwards * * *. Edwards cross-claimed against Key for negligence and fraud on the ground that Key had failed to provide adequate information concerning the potential toxicity of Theo-Dur. The jury returned verdicts in favor of Bocci and Edwards against Key. The jury awarded Bocci more than $5 million in compensatory damages and $35 million in punitive damages. The jury awarded Edwards $500,000 in compensatory damages and $22[.5] million in punitive damages."

178 Or App at 45-46. The jury's award was based on a special verdict that included findings that, on Edwards's cross-claims against Key, the latter was negligent and had made fraudulent misrepresentations to Edwards that caused him damage. The jury further found that Key had acted with wanton disregard for the health and safety of others and had knowingly withheld from or misrepresented to the Food and Drug Administration (FDA) or prescribing physicians information known to be material and relevant to theophylline toxicity.

After trial, Key moved for a judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur, making numerous arguments. One of those arguments was that the combined punitive damage awards to Bocci and Edwards were unconstitutionally excessive, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. As noted in our previous opinion, Key urged the trial court to apply the criteria for examining punitive damage awards set forth in ORS 30.925(2). Key argued that the "imposition in this case of actual damages in the combined amount exceeding $5.5 million by itself serves as a significant and retributive measure" and that the amount of the compensatory damages awarded should be considered in determining excessiveness. In their responses, Edwards and Bocci each presented arguments as to why their respective punitive damage awards were constitutional. In its reply to those arguments, Key posited that the issue was

"whether, *in combination*, they [*i.e.*, the punitive damage awards to Edwards and Bocci] exceed the maximum amount tolerable under the Due Process Clause because *both* awards are premised on the same factual basis and because the jury had before it all of the evidence pertaining to the totality of the wrongful conduct sought to be punished."

(Emphasis added.) The trial court accepted Key's formulation of the issue, applying the criteria set forth in ORS 30.925 to the combined awards to both Edwards and Bocci, but upheld the awards.

Key appealed, arguing, among other things, that the punitive damage award was excessive. Meanwhile, Key settled with Bocci, leaving the challenge as to the award of damages to Edwards only. Key contended that the trial court should have reviewed the punitive damages award to Edwards independently of the award to Bocci. According to Key, an award of $22.5 million in punitive damages is excessive in relation to the $500,000 that the jury awarded Edwards for compensatory damages.

We affirmed the judgment by an equally divided court, with the court dividing on a question unrelated to the punitive damages issue. In a concurring opinion, Judge Riggs, then a member of this court, explained on behalf of four members of this court that he would have rejected Key's challenge to the punitive damages award:

> "Key argues for the first time on appeal that the trial court erred in failing to review the punitive damage award to Edwards independently of the punitive damage award to Bocci * * *. Not only did Key fail to preserve this issue in the trial court, but it waived any argument on this point by specifically requesting the court to review the punitive damage awards in their entirety * * *."

*Bocci I*, 158 Or App at 547 (Riggs, J., concurring).

Key petitioned for review. Meanwhile, the Oregon Supreme Court decided *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 17 P3d 473 (2001), in which it evaluated a punitive damages award in light of recent pertinent decisions from the United States Supreme Court, in particular, *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). The Oregon Supreme Court remanded this case for reconsideration in light of *Parrott*. *Bocci v. Key Pharmaceuticals, Inc.*, 332 Or 39, 22 P3d 758 (2001).

In *Bocci II*, we evaluated the punitive damages award in light of *Parrott* and the authorities it discussed. We expressly adopted the concurring opinion in *Bocci I* as to the scope of the question before us. That is, we concluded that, by specifically requesting that the trial court evaluate the punitive damages awards in their entirety, Key waived any argument that the punitive damages should have been evaluated

separately. *Bocci II*, 178 Or App at 47. We ultimately concluded that, evaluated in their entirety, the punitive damages awards were not excessive. *Id.* at 51. The Oregon Supreme Court denied review, and Key petitioned for a writ of certiorari.

Meanwhile, the United States Supreme Court once again ventured into the realm of reviewing state court punitive damages awards in *State Farm v. Campbell*, 538 US ____, 123 S Ct 1513, 155 L Ed 2d 585 (2003). In that case, the Court concluded that the Utah Supreme Court had erred in reinstating a verdict for $145 million in punitive damages in a case involving $1 million in compensatory damages. The plaintiff insureds brought an action against the defendant automobile liability insurer for fraud, bad faith failure to settle within policy limits, and intentional infliction of emotional distress. The jury ultimately awarded the plaintiffs $2.6 million in compensatory damages and $145 million in punitive damages. The trial court, however, reduced the damages to $1 million in compensatory and $25 million in punitive damages. The Utah Supreme Court reinstated the original $145 million punitive damages award, relying in significant part on evidence concerning the defendant's national business practices over the preceding 20 years to meet corporate fiscal goals by capping payouts on claims. *Id.,* 538 US at ____, 123 S Ct at 1518-19.

The United States Supreme Court reversed and remanded. In evaluating the punitive damages award, the Court turned to the three-factor test that it had earlier announced in *Gore*, which requires courts to evaluate, *de novo*, punitive damages awards in light of

> "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*State Farm*, 538 US at ____, 123 S Ct at 1520. Applying the "*Gore* guideposts" to the facts of that case, the Court ultimately concluded that a punitive damages award roughly equal to the amount of compensatory damages likely would

be justified. In the process, the Court commented that, among other things, the Utah Supreme Court had erred in basing its decision on the defendant's so-called national policies, which the court characterized as "dissimilar acts, independent from the acts upon which liability was premised." *Id.* at ____ , 123 S Ct at 1523. According to the Court, "[a]lthough evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length." *Id.* at ____ , 123 S Ct at 1523.

The United States Supreme Court then acted on Key's petition in this case. It granted the petition, vacated our decision, and remanded to us for reconsideration in light of *State Farm*. The parties submitted briefing to us on the proper application of *State Farm*. In that supplemental briefing, Key argues that either the case should be reversed and remanded for a new trial or the punitive damages remitted to no more than $500,000. Edwards argues that we should simply affirm the existing punitive damages award. For the reasons that follow, we conclude that, in light of *State Farm*, we must remit the award of punitive damages to $3.5 million.

*State Farm* requires that we evaluate the punitive damages award in light of the three *Gore* guideposts, the first of which is, as we have mentioned, the "degree of reprehensibility of the defendant's conduct." *Id.* at 538 US at ____ , 123 S Ct at 1521. As the Court explained in *State Farm*, the relevant factors include whether

"the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.* at ____ , 123 S Ct at 1521.

Key contends that at least four of the relevant factors are completely absent in this case. According to Key, Edwards suffered no physical or economic injury apart from some "minimal" emotional distress. Moreover, it argues,

Key's conduct was not a threat to Edwards's health or safety, nor were there repeated instances of reckless or indifferent conduct toward Edwards. At best, Key argues, the jury's verdict may be taken to "imply" that Key had engaged in trickery or deceit. That, says Key, is not enough to support a claim for punitive damages.

Edwards argues that Key has ignored the nature of the jury's verdict and the relevant evidence in this case. He argues that Key's liability was based on persistent and aggressive promotion of Theo-Dur with material misrepresentations as to its safety, which evinced an indifference to and reckless disregard of the health and safety of others. That indifference and reckless behavior, Edwards argues, caused physical and economic harm to both himself and Bocci.

Key insists that Edwards focuses improperly on unrelated acts of misconduct that, under *State Farm*, are irrelevant. In particular, Key argues that, as in *State Farm*, so also in this case, we must reject consideration of its promotional activities outside of Oregon. According to Key, punitive damages may not be awarded by reference to such out-of-state conduct. Similarly, Key argues, under *State Farm*, it is inappropriate to consider the effect of its conduct on anyone other than Edwards, whose award of punitive damages is at issue.

■  We address, in turn, each of the five factors relevant to the reprehensibility of Key's conduct, beginning with the nature of the harm caused. At the outset, we note that the Court's description of the first factor in *State Farm* does not, by its terms, limit the scope of the evaluation to the single person in favor of whom punitive damages were awarded. In support of its argument to the contrary, Key relies on a reference in the Court's opinion that cautions against consideration of "other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis." *Id.* at ____, 123 S Ct at 1523. The Court's caution was delivered in the context of a discussion of the Utah Supreme Court's consideration of evidence of the defendant insurer's "dissimilar acts" in other cases that "bore no relation" to the harm that the plaintiffs suffered. That is not the case here. There is

nothing hypothetical about Bocci's claim against Key or the extensive and permanent brain damage that Key caused him. Moreover, Key's actions with respect to Bocci were not dissimilar at all. They were, in all material respects, the same acts that caused harm to Edwards. In any event, the evidence in this case shows that Key also caused Edwards emotional distress and associated physical harm of more than the "minimal" nature that Key describes.

■ We turn to whether Key's conduct evinced indifference or reckless disregard "of the health and safety of others." *Id.* at ____ , 123 S Ct at 1521. Again, Key focuses on whether it disregarded the health and safety of Edwards, when the relevant factor is not so narrowly focused. What is more, Key ignores the jury's findings by clear and convincing evidence that Key acted with wanton disregard for the health and safety of others in knowingly and falsely promoting its product as safe. Key's argument that its out-of-state promotional activities are irrelevant is not well-taken. The Court in *State Farm* said that a jury "may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." *Id.* at ____ , 123 S Ct at 1522-23. It did not say that out-of-state conduct is *per se* irrelevant. To the contrary, it said that "evidence of repeated misconduct of the sort that injured" the plaintiff is entirely relevant. *Id.* at ____ , 123 S Ct at 1523. In this case, there was evidence that Key engaged in nationwide misconduct in disseminating false and misleading information to the FDA and to physicians about Theo-Dur and that the dissemination of that misleading information led to Bocci's and Edwards's damages. That is not the sort of evidence that *State Farm* suggests is inappropriate to consider in evaluating punitive damages.

The third factor is whether "the target of the conduct had financial vulnerability." *Id.* at ____ , 123 S Ct at 1521. Neither party addresses that factor.

Next, we consider whether the conduct "involved repeated actions or was an isolated incident." *Id.* at ____ , 123 S Ct at 1521. As we have noted, there is evidence of Key's continuing misrepresentations concerning the safety of its product.

■ Finally, we consider whether "the harm was a result of intentional malice, trickery, or deceit, or mere accident." *Id.* at ___, 123 S Ct at 1521. Key acknowledges that it may be "implied" from the jury's verdict that trickery or deceit was involved. The jury, in fact, found that Key had knowingly withheld or misrepresented information to the FDA or prescribing physicians concerning theophylline toxicity and the safety of Theo-Dur. In short, contrary to what Key suggests to us, there is substantial evidence of four of the five relevant considerations as to the reprehensibility of its conduct.

We turn, then, to consideration of the second of the *Gore* guideposts, namely, an evaluation of "the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* at ___, 123 S Ct 1524. The Court explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at ___, 123 S Ct 1524. The Court noted that in previous cases it had held that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* at ___, 123 S Ct 1524 (citing *Pacific Mutual Life Insurance Company v. Haslip*, 499 US 1, 23-24, 111 S Ct 1032, 113 L Ed 2d 1 (1991)). It then cited *Gore* for the same proposition, that is, that a 4-to-1 ratio may be close to the limits of constitutionality. *State Farm*, 538 US at ___, 123 S Ct at 1524 (citing *Gore*, 517 US at 581). The Court added, however, that a higher ratio might be appropriate "where a particularly egregious act resulted in only a small amount of economic damages." *State Farm*, 538 US at ___, 123 S Ct at 1524 (internal quotation marks omitted).

■ In this case, Key argues that the ratio of $22.5 million in punitive damages to $500,000 in compensatory damages awarded to Edwards is 45 to 1, which it argues is presumptively invalid. Edwards objects to the consideration of punitive and compensatory damages to Edwards independent of the damages awarded to Bocci on the ground that Key waived the argument at trial, as we held in *Bocci II*. Key acknowledges that we held that its argument was waived; it insists that we were wrong in so holding and that, in any event, in light of *State Farm*, we are now required to evaluate

the ratio between the harm "to the plaintiff" and the punitive damage award. *Id.* at ____ , 123 S Ct at 1524.

We need not devote too much time to resolving the question whether the relevant ratio of punitive to compensatory damages includes only Edwards's damages as opposed to Edwards's and Bocci's in combination. *Either way*, the ratio exceeds single digits.

As Key correctly notes, the ratio of Edwards's punitive damages ($22.5 million) to his compensatory damages ($500,000) is 45 to 1. That is clearly in excess of the single-digit neighborhood that the Court has suggested lies at the outer edge of constitutionality. The ratio of combined punitive damages ($55.5 million) to combined compensatory damages ($5.5 million) is in excess of 10 to 1. Even that ratio exceeds single digits. Indeed, it exceeds by two and a half times the ratio of 4 to 1 that the Court suggested "might be close to the line of constitutional impropriety." *Id.* at ____ , 123 S Ct at 1524.

The question, then, is whether there are circumstances present in this case that would justify a ratio higher than 4 to 1. As we have noted, the Court suggested that a higher ratio may be appropriate when a "particularly egregious act" resulted in only a small amount of economic damages. *Id.* at ____ , 123 S Ct at 1524. We would expect, for example, that intentionally malicious conduct that produces only a small amount of compensatory damages would justify a higher ratio.

In this case, there is, as we have noted, evidence of deceitful conduct involving the promotion of a prescription drug as "safe" when it was not, which resulted in misdiagnosis and consequent severe physical injury. It is conduct that is much more reprehensible and blameworthy than an isolated incident or mere accident. Thus, we are willing to approve a ratio in excess of the 4-to-1 ratio that apparently is something of a benchmark for the United States Supreme Court. But, having said that, we must also conclude that Key's conduct does not rise to the level of "particularly egregious," intentionally malicious acts that would justify a ratio in excess of single digits. Under the circumstances of this

case, we conclude that the ratio of punitive to compensatory damages is excessive.

The final *Gore* guidepost is the "difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at _____ , 123 S Ct at 1520. Key offers no argument regarding that factor. Edwards argues that Key's misconduct in reporting misleading information could have subjected it to criminal prosecution. In *State Farm,* however, the Court cautioned:

> "The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."

*Id.* at _____ , 123 S Ct at 1526.

■ Taking all relevant considerations into account, we conclude that the punitive damages award to Edwards exceeds the amount tolerable under the Due Process Clause. We conclude that a ratio of punitive to compensatory damages in the amount of 7 to 1 is constitutionally permissible.

■ Because only the award to Edwards is at issue on appeal, the 7-to-1 ratio must be applied to the compensatory damages awarded to Edwards. *See id.* at _____ , 123 S Ct at 1520 (the proper measure is the "disparity between the actual or potential harm *suffered by the plaintiff* and the punitive damages award"). Edwards was awarded $500,000 in compensatory damages. An appropriate amount of punitive damages therefore is seven times that amount, or $3.5 million.[1]

---

[1] It could be argued—although Edwards does not make the point—that, because Key did not argue that the punitive damages awarded to Edwards should be evaluated independently of the damages awarded to Bocci, we should not apply

Judgment in favor of Edwards for punitive damages vacated and remanded with instructions to allow defendants' motion for a new trial unless Edwards agrees to remittitur of punitive damages to $3.5 million within 28 days of entry of the appellate judgment; otherwise affirmed.

---

the 7-to-1 ratio to Edwards's damages alone. On reflection, however, it becomes clear that that is not possible. Applying the 7-to-1 ratio to the combined compensatory damages clearly is unfair. It would permit Edwards to recover punitive damages based on compensatory damages to someone else, namely Bocci. Applying the 7-to-1 ratio to the combined compensatory damages in proportion to Edwards's share of the punitive damages likewise is not logical. We can envision no reason why Edwards's share of compensatory damages should be anything other than what the jury actually awarded. Finally, applying the 7-to-1 ratio to the combined compensatory damages in proportion to Edwards's share of the compensatory damages is tautological, that is, it makes no difference from simply applying the ratio to Edwards's actual share of the compensatory damages. We therefore conclude that the proper award of punitive damages to Edwards is seven times the compensatory damages that he actually was awarded, or $3.5 million.