Argued and submitted August 17, 2007, judgment vacated and remanded with instructions to grant defendant's motion for a new trial limited to punitive damages, unless plaintiff agrees to remittitur of punitive damages to four times the compensatory damage award September 10, 2008

Ken HAMLIN,
*Plaintiff-Respondent,*

*v.*

HAMPTON LUMBER MILLS, INC.,
an Oregon corporation,
dba Willamina Lumber Company,
*Defendant-Appellant.*

Multnomah County Circuit Court

040302235; A130213

193 P3d 46

Brenda K. Baumgart argued the cause for appellant. On the opening brief were Edwin A. Harnden, Bradley F. Tellam, and Barran Liebman LLP. With her on the reply brief were Edwin A. Harnden and Barran Liebman LLP.

Craig A. Crispin argued the cause for respondent. With him on the brief was Crispin Employment Lawyers.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Defendant appeals a judgment awarding plaintiff $175,000 in punitive damages for defendant's failure to comply with ORS 659A.043(1) when it did not reinstate plaintiff as an employee after he had recovered from a work-related injury.[1] Defendant makes two assignments of error: (1) the trial court erred in denying its motion for a directed verdict on plaintiff's claim for punitive damages, and (2) the court erred in refusing to reduce the punitive damage award as constitutionally excessive. As described below, we affirm with respect to defendant's first assignment of error. However, we conclude that the punitive damages are constitutionally excessive, and that the trial court erred by not reducing them. Hence, we vacate and remand with instructions to grant defendant's motion for a new trial, limited to punitive damages, unless plaintiff agrees to remittitur of punitive damages to an amount four times the compensatory damage award.

Because the jury found in plaintiff's favor, we state the facts in the light most favorable to him. *Boothby v. D. R. Johnson Lumber Co.*, 341 Or 35, 38, 137 P3d 699 (2006). In July 2002, defendant hired plaintiff as a temporary employee at its lumber mill through Express Personnel Services (Express). Upon his first arrival at the mill, plaintiff met with Housden, who was supervisor of the mill's finger-joint department. Housden began a safety orientation with plaintiff, and turned plaintiff over to Fahy, who was the "lead" for plaintiff's shift. Housden told plaintiff to follow Fahy's directions, and also to learn his job by "watch[ing] what was going on around [him, and] observ[ing] what other people were doing." Fahy completed the orientation, which, in all, lasted approximately 45 minutes. During that orientation and his subsequent shifts, plaintiff was not trained on how to respond to a "lock out" situation, such as when an employee

---

[1] ORS 659A.043(1) provides, in part:

"A worker who has sustained a compensable injury shall be reinstated by the worker's employer to the worker's former position of employment upon demand for such reinstatement, if the position exists and is available and the worker is not disabled from performing the duties of such position."

needs to stop machinery in order to clear a board jam or perform repairs safely. In those situations, the employee is expected to use locks that are issued to employees to prevent others from restarting machinery while it is being serviced. Housden testified that mill employees typically were not issued such locks for their first two weeks on the job; however, he conceded that plaintiff was "not properly trained on how to safely clear a jam" and was not given sufficient information about how to respond to a lock out situation.

On plaintiff's third night on the job, Fahy asked plaintiff to work on a catwalk near where a conveyor belt moved boards into bins, and he explained to plaintiff that he needed to "move the boards away from the belts [so that they] didn't pile up in one spot." According to plaintiff, Fahy told him to step over the handrail and "hold onto the bar" near plaintiff's head and either kick the boards with his feet or move the boards with his hands. Plaintiff testified that Fahy stepped over the handrail and demonstrated how to kick and handle the boards to prevent a pileup. Plaintiff further said that, over the course of working there, he had seen others step over the handrail to clear boards in a similar way.

Some time after Fahy left plaintiff, plaintiff smelled smoke and noticed that a board had become wedged between the moving belt and the bin in which it was supposed to fall. Plaintiff yelled to an employee working at a nearby station for instructions on what to do. Plaintiff thought he heard Fahy behind him, telling him to "just grab the board." Plaintiff did that, and his hand got caught in the belt, seriously injuring his thumb.

Housden, who had not been working during that shift, received a call at home about the accident and drove to the hospital to speak with plaintiff when he was receiving emergency treatment; Housden also drove plaintiff's truck to his home the following day. On both occasions, Housden heard plaintiff and plaintiff's wife express concern over plaintiff losing the job at the mill, and he told plaintiff that his job "was safe," "not to worry about his job [and that] everything was fine." Housden did not indicate to plaintiff that the accident was plaintiff's fault or that plaintiff had done anything wrong in trying to clear the jam.

Plaintiff received further treatment on his thumb, including partial amputation. He filed a workers' compensation claim. He also filed a safety complaint with Oregon OSHA, which investigated the incident in September and concluded that defendant did not commit a safety violation relative to plaintiff's injury. Plaintiff's doctor released him by late August to do light-duty work. Defendant did not have light-duty work for which it required Express's services, and plaintiff performed light work through Express for other employers. Although defendant became aware through communications with Express regarding plaintiff's workers' compensation claim that plaintiff had been released for light-duty work, defendant did not indicate that it did not intend to reinstate plaintiff if he was released for regular work.

In the meantime, Housden had filled out an injury report the day after plaintiff's accident. Nothing in that report indicated that Housden thought that plaintiff was a safety risk. Soon after the accident, Hart, the mill manager, had told Housden to talk to him before allowing plaintiff back into the mill. However, it does not appear that defendant initiated any follow-up investigation of the incident, any interviews with staff or supervisors on the floor at the time, any interviews with plaintiff in relation to the accident, or any disciplinary action against anyone involved. Some time after the accident but before plaintiff requested reinstatement, defendant had discovered that it was another temporary employee, not Fahy, who had directed plaintiff to grab the jammed board. At that point, that person no longer worked for defendant, having been terminated previously for an unrelated reason.

Plaintiff was released to resume regular work in November 2002, at which point his workers' compensation benefits ended. He called and wrote to Express to request that he be reinstated in his position with defendant. Express contacted the Oregon Bureau of Labor and Industries (BOLI) to inquire anonymously about whether a temporary employee in plaintiff's position had reinstatement rights. Express learned that temporary employees, such as plaintiff, generally had reinstatement rights under ORS 659A.043. Express communicated that information to Blackwell, the human resources manager for the mill.

After receiving that information from Express, Blackwell, Hart, and two other managers exchanged several e-mails over a few hours discussing the situation. Blackwell explained to Hart and the other managers what Express had communicated to him regarding plaintiff's reinstatement rights. Blackwell further indicated that, when Express had asked BOLI whether an employee could be denied reinstatement for a safety violation, the BOLI representative

> "asked questions such as: 1) Have other employees been terminated for the same or similar safety violations on a first offense? 2) Was the employee properly trained on how to safely clear a jam-up in this area? * * * Are there clearly defined methods/guidelines for how an employee should safely complete this task? If so, was the employee made aware of them?"

Hart replied that he thought that they should talk in person about the situation, but indicated that, at that point, he was opposed to plaintiff's return to the mill. He stated that he "believe[d]" that the mill had terminated other employees for similar first-time safety violations but could not "recall an example" at that time.[2] He further opined that plaintiff had been "willfully * * * insubordinate to instruction given to him by * * * Housden" during the orientation, that the incident led to an OSHA investigation that revealed no wrongdoing on defendant's part in relation to the accident, that plaintiff had been "properly trained in that he was clearly instructed that he could not perform any tasks related to lockout," and that, based on the accident, plaintiff "lacked the common sense and judgment to work in a manufacturing environment" and was a risk to himself and others at the mill. After that series of e-mails, defendant told Express that it would not reinstate plaintiff because he was a "safety risk." Express then passed that information on to plaintiff.

---

[2] Housden testified to one incident before plaintiff's injury where he terminated an employee for wearing his hard hat sideways, a safety violation. In that situation, Housden warned the employee of the violation, and terminated him when the employee ignored the warning. Housden also described at least two other incidents that occurred after plaintiff's injury where he recommended discipline for employees who had committed safety violations; those employees were terminated immediately after their respective violations.

Plaintiff sued, alleging, among other things, that defendant had failed to reinstate him in accord with ORS 659A.040 to 659A.043. At trial, defendant moved for a directed verdict at the close of plaintiff's case-in-chief and renewed that motion at the close of all evidence, arguing that plaintiff failed to present any evidence warranting a punitive damage award as to that claim. The trial court denied both the original and the renewed motions. Subsequently, the jury determined that defendant violated ORS 659A.043 by failing to reinstate plaintiff. It awarded plaintiff $10,000 in economic damages, but found that plaintiff had failed to mitigate those damages by $4,000. It further determined that plaintiff proved by clear and convincing evidence that punitive damages should be assessed against defendant, and set that amount at $175,000. The jury expressly found that plaintiff sustained no noneconomic damages as a result of plaintiff's conduct. Following the trial, defendant moved for a judgment notwithstanding the verdict and, in the alternative, a new trial on the jury's verdict on punitive damages. The trial court denied those motions.

■■ We begin with defendant's first assignment of error, *viz.*, that the trial court erred in denying its motion for a directed verdict because plaintiff did not present sufficient evidence to support an award of punitive damages. We review the denial of defendant's motion for a directed verdict by considering the evidence, including any reasonable inferences drawn from that evidence, in the light most favorable to the plaintiff, the party that obtained a favorable verdict. *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003). That verdict cannot be set aside "unless there was no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action." *Id.*[3]

---

[3] Although defendant initially states the correct standard of review in its brief, it appears to contend that we must review the facts by the clear and convincing standard required for the underlying claim for punitive damages. *See* ORS 31.730(1) (requiring evidence to satisfy clear and convincing standard for punitive damages to be recoverable in civil actions). Defendant is incorrect inasmuch as it argues that we need to reevaluate the underlying evidence to determine whether it satisfies a clear and convincing standard. The "any evidence" standard is the appropriate standard of review for the denial of a directed verdict, regardless of

In light of that standard, there is ample evidence to support the jury's finding of facts necessary to support an award of punitive damages. ORS 31.730(1) governs the standards for awards of punitive damages, and provides that those awards may not be recovered in civil actions

> "unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others."

■     Based on the preceding statement of facts, a rational juror could find the following facts: (1) Plaintiff was injured when he followed instructions given to him by defendant, which had failed to properly train and supervise him. (2) Defendant told plaintiff on multiple occasions that his job was safe, and, over the months during which plaintiff recovered from the injury and remained in contact with defendant through Express, did nothing to inform plaintiff that he was a "safety risk" and that it did not intend to rehire him. (3) In the months before plaintiff requested reinstatement, defendant did nothing by way of an internal investigation that could compel its later conclusion that plaintiff was a safety risk. (4) Defendant was aware of plaintiff's financial vulnerability, his pending workers' compensation claim, the OSHA investigation that resulted from the accident, and the possibility that plaintiff would sue defendant. (5) Defendant, in a hasty series of e-mails exchanged between managers who were not involved in plaintiff's injury or training, concluded that plaintiff was a "safety risk" only after it discovered that plaintiff had a statutory right to reinstatement under ORS 659A.043. In all, a reasonable jury could have understood those facts and inferences to constitute clear and convincing evidence that defendant acted with the required "malice" to warrant an award of punitive damages. ORS 31.730(1). Hence, the trial court did not err in denying defendant's

whether the underlying claim requires a clear and convincing standard. *See Bolt v. Influence, Inc.*, 333 Or 572, 578 n 2, 43 P3d 425 (2002) (rejecting suggestion that the "clear and convincing" evidentiary standard is appropriate when reviewing the denial of a motion for directed verdict with respect to punitive damages).

motion for a directed verdict on plaintiff's request to submit punitive damages to the jury.[4] Accordingly, we turn to defendant's second assignment of error, in which it challenges the punitive damages awarded to plaintiff as "grossly excessive" in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

■ "Grossly excessive" punitive damage awards violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, primarily because such damages serve no legitimate purpose and constitute arbitrary deprivations of property. *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996) (*Gore*). In reviewing whether a punitive damage award is grossly excessive, we adhere to the following methodology set forth by the Oregon Supreme Court in *Goddard v. Farmers Ins. Co.*, 344 Or 232, 179 P3d 645 (2008). First, we review the evidence in the record in the light most favorable to the party that obtained the award to determine whether there is a factual predicate for a punitive damage award. *Id.* at 261. Second, we apply "constitutionally prescribed guideposts to those predicate facts to determine if, as a matter of law, the award is grossly excessive." *Id.* Those guideposts, first identified by the United States Supreme Court in *Gore*, are:

> "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*State Farm Mut. Ins. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*); *see also Goddard*, 344 Or at 261-65 (describing and applying *Gore* guideposts). Finally, if that analysis leads us to conclude that the award is

---

[4] To the extent that defendant challenges its renewed motion for directed verdict and motion for judgment notwithstanding the verdict and a new trial based on insufficiency of evidence, we have previously stated that such motions are unreviewable. *See Iron Horse Engineering v. Northwest Rubber*, 193 Or App 402, 415, 89 P3d 1249, *rev den*, 337 Or 657 (2004); *see also Meyers v. Oasis Sanitorium, Inc.*, 224 Or 414, 418, 356 P2d 159 (1960) (stating that party challenging sufficiency of evidence to support verdict against it must move for directed verdict and assign error to denial of that motion).

grossly excessive, we then use those same guideposts to determine the maximum lawful amount of punitive damages that a rational juror could award. *Goddard*, 344 Or at 261-62.

As to our first task of fixing the factual predicate for an award of punitive damages, our analysis of defendant's first assignment of error and the relevant evidence, 222 Or App at 236-37, satisfies that exercise. Thus, with the factual predicate established, we move to the second step, in which we determine whether the punitive damage award is "grossly excessive" by applying the three guideposts described above.

The first guidepost requires us to assess "the degree of reprehensibility of the defendant's misconduct." In applying the first guidepost, we consider several "aggravating factors," first set out by the Court in *Gore*, that are "associated with particularly reprehensible conduct." 517 US at 576. Those factors include whether

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."

*Goddard*, 344 Or at 253 (internal quotation marks and citation omitted).

Oregon courts have had several opportunities to apply those factors in cases where, as here, the plaintiffs sustained only financial harm. Most recently, *Goddard* involved an employee of the defendant insurer who engaged in extensive and repeated "stonewalling" and "low-balling" during claims evaluation and settlement processes that exposed its insured to a "devastating" verdict in a no-defense case. 344 Or at 262. The Supreme Court described the defendant's actions as "very reprehensible," *id.* at 268, and found that three *Gore* factors were present: the defendant knew of the plaintiff's financial vulnerability, the evidence indicated a "modest level of 'repeated action' " by the defendant against

both the insured in that case as well other insureds, and the defendant acted with "malice, *i.e.*, intentionally, without just cause or excuse, in its dealings with [the insured]." *Id.* at 266-67.

A case that we decided before the Supreme Court affirmed *Goddard*, *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or App 553, 152 P3d 940 (2007), involved a misrepresentation claim in connection with a loan made by the defendant's employee to the plaintiffs. We described that case as one of "only moderate reprehensibility," *id.* at 586, where only two of the *Gore* factors were present: the plaintiffs were financially vulnerable, and the defendant engaged in intentional trickery and deceit. There, the defendant's employee lied to the plaintiffs to convince them to abandon their existing loan for a significantly less advantageous one. As a consequence of the defendant's conduct, the plaintiffs suffered financial loss as well as "anxiety about the apparently potential repossession of their home." *Id.*

Here, the first two factors—physical harm and indifference to or reckless disregard of others' health or safety— are not in play, although the absence of those factors is not unusual where the harm at issue is strictly financial. *See Goddard*, 344 Or at 268 (observing that "cases of economic harm * * * seldom provide malefactors with an opportunity" to satisfy the criteria of the first two *Gore* factors). Indeed, plaintiff suffered no physical harm as a result of defendant's refusal to rehire him, and defendant's conduct toward plaintiff cannot be said to evince indifference or reckless disregard to others' safety. Further, the facts do not implicate the fourth factor. Inasmuch as defendant led plaintiff to believe that he would be reinstated before it refused to hire him, that conduct toward him cannot be described as "repeated." In addition, nothing in the record suggests that defendant's conduct was part of a pattern of ongoing behavior toward its employees in general.

However, as in *Vasquez-Lopez*, two factors are present here: plaintiff was financially vulnerable, and, to a degree, harm resulted from defendant's "intentional malice, trickery, or deceit." As to financial vulnerability, defendant was aware of the status of plaintiff's workers' compensation

claim. In addition, Housden knew from speaking to plaintiff and his wife that they were worried about plaintiff losing his employment with defendant and the income that that employment provided. As to the resulting harm, as explained above, the evidence in the record was sufficient for a reasonable jury to conclude that defendant acted with "malice, *i.e.*, intentionally, without just cause or excuse, in its dealings" with plaintiff. *Goddard*, 344 Or at 267. Here, defendant refused to reinstate plaintiff after: (1) plaintiff's supervisor indicated to him that his position was waiting for him after his recovery; (2) defendant did nothing by way of investigation after the accident consistent with its later conclusion that plaintiff was a safety risk; (3) plaintiff's accident resulted in a workers' compensation claim, OSHA investigation, and a potential civil suit; and (4) defendant summarily concluded that plaintiff was a safety risk only after discovering that plaintiff had a right to reinstatement. Those facts, taken together, support the conclusion that defendant acted with intentional malice in refusing to reinstate plaintiff.

To summarize, two factors are present here: financial vulnerability and intentional malice; the remaining three—physical harm, indifference to or reckless disregard of health or safety, and repeated conduct—are absent. Taken together with the consideration that defendant's wrongdoing was of a purely economic nature, our analysis leads us to conclude that defendant's conduct was of moderate reprehensibility.

■■ At the second *Gore* guidepost, we look at "the ratio between the punitive damages award and the 'actual and potential harm suffered by the plaintiff.' " *Goddard*, 344 Or at 268 (quoting *Campbell*, 538 US at 418). Although there is no maximum "bright-line ratio" that punitive damages cannot exceed, *id.* at 255, as a general rule, due process will not permit a punitive damage award exceeding a single-digit ratio to the compensatory damage award. *Id.* at 259. Further, if the injuries that defendant has caused are strictly economic, a punitive damage award generally may not significantly exceed four times the amount of the injured party's compensatory damages. *Id.* at 260. However, a ratio greater than four to one may be appropriate in some circumstances,

"such as when the economic damages are relatively small in relation to the theoretical injury, where the injury is difficult to detect, where the conduct causes noneconomic harm that is hard to value, or where the conduct is 'extraordinarily' reprehensible."

*Id.* at 261.

To assess the constitutionality of the ratio here, we first must identify the denominator, that is, the amount of plaintiff's actual or potential harm. *See Williams v. Philip Morris Inc.*, 340 Or 35, 60, 127 P3d 1165 (2006), *vac'd on other grounds*, 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940 (2007) ("To determine the denominator of the ratio, we consider not only the harm actually suffered by plaintiff, but also the potential harm to plaintiff."). Here, the parties disagree on what the proper denominator should be. Plaintiff argues that the proper denominator should be at least $10,000, the total amount awarded to plaintiff as compensatory damages without subtracting the $4,000 in damages that the jury determined that plaintiff had failed to mitigate. Defendant, on the other hand, argues that the proper denominator is $6,000, which represents the $10,000 in wage loss less $4,000 for plaintiff's failure to mitigate his damages. We agree with defendant.

Although the number is not always immediately apparent, Oregon courts have held that the proper measure of the actual and potential damages are the amounts for which the party causing the harm is responsible. In *Goddard*, for example, the plaintiff was awarded a total of $863,274 in economic damages, with a comparative fault of 80 percent attributed to the defendant and 20 percent attributed to the insured, a nonparty to that action. 344 Or at 249. In that case, the plaintiff argued that the full $863,274 was the proper denominator for determining the constitutionality of the punitive damage award. *Id.* at 268. The Supreme Court disagreed, stating that "the actual and potential harm suffered * * * in this case [is] 80 percent of $863,274." *Id.* at 268-69. As the court observed:

"[The d]efendant is not responsible for paying that part of the compensatory damages that resulted from [the insured's] misconduct; neither should [the] defendant be

made to pay extra punitive damages in proportion to [the insured's] own misconduct."

*Id.* at 268; *see also Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 183 n 6, 78 P3d 570 (2003) (determining that, when the plaintiff was comparatively negligent, proper denominator reflected percentage of judgment for which the defendant was responsible).

The facts and rationale in those comparative fault cases are analogous to plaintiff's failure to mitigate here. As in *Goddard*, where that defendant was not responsible for the 20 percent of the economic damages attributed to the insured, defendant here is not responsible for the $4,000 in damages that plaintiff failed to mitigate. Accordingly, the same principle of fairness articulated in *Goddard* applies: defendant here should be held liable for punitive damages in proportion only to the damages that it would have caused had plaintiff properly mitigated the harm. In this case, although the total economic damages were $10,000, defendant was responsible for only $6,000 because plaintiff failed to mitigate those damages by $4,000. Accordingly, $6,000 represents the full extent of plaintiff's actual and potential damages.[5] Hence, we conclude that the constitutionally permissible punitive damage award in this case will be some multiple of the actual harm to plaintiff: $6,000 plus accrued prejudgment interest.[6] *See Goddard*, 344 Or at 269-70 (actual and potential harm includes accrued prejudgment interest).

---

[5] We note that it is not unusual for a party's potential damages to exceed the actual damages. *See, e.g., Williams*, 340 Or at 60-61 (noting that cigarette manufacturer's damages in wrongful death suit would have been higher if not for deceased's death soon after diagnosis); *Vasquez-Lopez*, 210 Or App at 585 (stating that the plaintiffs' damages would have been "catastrophic" had predatory lender's plan gone on unchecked).

[6] We are unable to determine the precise amount of the prejudgment interest paid here. In a General Money Judgment entered on August 25, 2005, that amount was calculated to be $1,450.98. However, in a second General Money Judgment entered October 14, 2005, after the court denied defendant's post-verdict motions, prejudgment interest was described as "9% per annum, compounded annually, on the sum of $10,000 from January 4, 2002 through entry of judgment." Accordingly, we leave the exact calculation of the prejudgment interest to the trial court on remand.

Thus, using $6,000 as a denominator to the punitive damage award of $175,000, the ratio of compensatory damages to punitive damages is nearly 30 to 1. Even when including an estimated amount of prejudgment interest in the denominator, the ratio remains in the double digits, far exceeding the four-to-one ratio set as the "general" ceiling on punitive damages where the only harm is financial and, indeed, the putative single-digit limit for punitive damages generally for torts involving physical harm. *Goddard*, 344 Or at 258-60.

Acknowledging those benchmark ratios of four to one and nine to one, we nonetheless are reminded by the United State Supreme Court's caution in *Gore* that

"[w]e need not, and indeed, we cannot, draw a mathematical bright line between the constitutionally acceptable and constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus."

517 US at 582-83 (brackets and ellipsis in original) (internal quotation marks and citations omitted). Indeed, we are permitted some flexibility in determining an acceptable range of ratios between compensatory and punitive damage awards. As noted above, the court may permit punitive damages to exceed the bounds of the established ratios when, for example, (1) a particularly egregious act causes a comparatively small economic injury, (2) the injury is difficult to detect, (3) the conduct causes noneconomic harm that is difficult to value, or (4) the conduct is extraordinarily reprehensible, *Goddard*, 344 Or at 261, such as the decades-long mass fraud perpetuated on the public by the defendant in *Williams. Id.* at 270. Here, the second, third, and fourth considerations are absent. Plaintiff's injury was not hard to detect; plaintiff's noneconomic harm, by the jury's findings, was nonexistent, not "hard to value"; and defendant's conduct was, at most, only moderately reprehensible in light of the factors set out in *Gore* and *Goddard*.

Nonetheless, we do find that the first consideration—a particularly egregious act causing a comparatively small economic injury—factors into our calculus here. At the outset, we note that our case law discussing what constitutes

a particularly egregious act or a small award is limited to a pre-*Goddard* case, *Bocci v. Key Pharmaceuticals, Inc.*, 189 Or App 349, 76 P3d 669, *adh'd to on recons*, 190 Or App 407, 79 P3d 908 (2003). There, we noted that "intentionally malicious conduct that produces only a small amount of compensatory damages" could justify a higher ratio. *Id.* at 360. In that case, the plaintiff's compensatory damages totaled $500,000 (compared to the 45-to-1 punitive damages awarded by the jury) where the defendant knowingly withheld or misrepresented information from the FDA and physicians about its product's risks of toxicity. We concluded that, although the defendant's conduct was highly reprehensible, it did not "rise to the level of 'particularly egregious,' intentionally malicious acts" justifying a ratio exceeding single digits. *Id.*

The circumstances here compel a somewhat different approach than the one that we took in *Bocci*. To wit, we understand the focus of this narrow consideration to be more on the smallness of the compensatory damages and less on the egregiousness of the conduct. As a general matter, we require a jury finding of malicious or intentional conduct for a plaintiff to receive *any* award of punitive damages. Further, we assess the reprehensibility of the conduct in the guideposts analysis. To then further assess the egregiousness of the act would require us to rehash the facts that led us to conclude in the first place whether punitive damages were available and, if so, how reprehensible the defendant's conduct was. Indeed, our Supreme Court has characterized the purpose of punitive damages as "a means of punishing a defendant for *particularly egregious conduct* and deterring such conduct in the future[,]" *DeMendoza v. Huffman*, 334 Or 425, 436, 51 P3d 1232 (2002) (emphasis added), a concept that dated back to the drafting of Article I, section 10, of the Oregon Constitution. *Id.* at 445-46.

Rather, we are mindful that, while due process under the federal constitution imposes a ceiling on punitive damages, punitive damages also require a floor to effectuate their purpose. *See North Marion Sch. Dist. #15 v. Acstar Ins. Co.*, 343 Or 305, 315, 169 P3d 1224 (2007) ("Punitive damages * * * are imposed as a penalty to deter tortious conduct[.]"); *DeMendoza*, 334 Or at 446 ("[P]unitive damages were understood [by the Oregon Constitution's drafters] as a

means of vindicating society's interest in punishing and deterring especially egregious conduct[.]"). Thus, we understand the principle of a particularly egregious act causing a small amount of economic damages to address the countervailing concern that, although due process imposes an upper limit to punitive damage awards, the inherent purposes of punitive damages to penalize and deter permit a more expansive award than that dictated by the ratio analysis in those circumstances. Accordingly, it would appear that, under circumstances where the compensatory damage award can be properly characterized as "small," we need not dwell on whether the conduct was "particularly egregious."

Hence, we turn to the circumstances here. Although there may be some argument as to what constitutes a "small" economic award, we can easily conclude that the damages here, $6,000 in lost wages, is small in the universe of economic damage awards. *See, e.g., Goddard,* 344 Or at 270 (compensatory damages of $690,619 plus prejudgment interest were "substantial"); *Williams,* 340 Or at 44 (total compensatory damages capped at $521,485); *Vasquez-Lopez,* 210 Or App at 581 (actual compensatory damages were $31,639); *Bocci,* 189 Or App at 354 (compensatory damages were $500,000). Accordingly, that factor could support a somewhat higher ratio of punitive damages to plaintiff's compensatory damage award than what the first two guideposts alone would suggest. However, absent any other factors in what otherwise appears to be a typical punitive damage case involving only economic injuries, a punitive damage award totaling 30 times the amount of plaintiff's harm of $6,000 appears to be excessive.

Our analysis under the third *Gore* guidepost—the consideration of comparable criminal or civil sanctions—does not alter that conclusion. The Oregon Supreme Court, in *Williams,* explained the three steps that courts must take under that guidepost:

"First, courts must identify comparable civil or criminal sanctions. Second, courts must consider how serious the comparable sanctions are, relative to the universe of sanctions that the legislature authorizes to punish inappropriate conduct. Third, courts must then evaluate the punitive

> damages award in light of the relative severity of the com-
> parable sanctions."

340 Or at 58. Under that analysis, severe state sanctions could support a more substantial punitive damage award, whereas "mild, trivial, or nonexistent" state sanctions could militate against a significant punitive damages award. *Id*.

Here, the parties do not cite to us comparable civil or criminal sanctions. Indeed, our independent investigation yielded no criminal sanctions implicated by defendant's misconduct. As for civil sanctions, a violation of ORS 659A.043 does not appear to incur a civil penalty or fee payable to the state. However, it appears that a civil action such as the one brought by plaintiff here is the designated penalty against an employer who commits an unlawful employment practice such as a violation of ORS 659A.043. The legislature specifically created the right to bring a civil action for those parties aggrieved by alleged unlawful employment practices. ORS 659A.885(1). The measures of relief afforded a successful plaintiff claiming an unlawful practice may include injunctive or other appropriate equitable relief, up to two years' back pay, and attorney fees and costs. *Id*. In addition, a plaintiff alleging a violation of ORS 659A.043 may be awarded the greater of compensatory damages or $200, and punitive damages. ORS 659A.885(3)(a). In short, the sanction is the civil suit brought by the plaintiff against the defendant. As such, we cannot describe the sanction as particularly severe, but nor can we say that it is "mild, trivial, or nonexistent." Thus, our analysis under the third *Gore* guidepost neither militates against nor supports a more significant punitive damage award.

Nonetheless, we easily conclude that the jury's punitive damage award here of $175,000 is "grossly excessive." The roughly 30-to-1 ratio greatly exceeds the four-to-one ratio that the Oregon Supreme Court has designated as the "general" limit for punitive damage awards where the only harm is economic, not physical. Our foregoing analysis indicates that *some* award of punitive damages is allowable; however, here our conclusions under those guideposts do not support an award of 30 to 1.

■     Thus, we are left to the final task of our inquiry: determining what the highest constitutional amount of punitive damages that plaintiff in this case may recover. To do so, we use the same guideposts we explored above "to determine the highest lawful amount of punitive damages that a rational juror could award, consistent with the Due Process Clause." *Goddard*, 344 Or at 262. As part of that analysis, we

> "must in some sense reexamine the evidence in the record— not to redecide the historical facts as decided by the jury, but to decide where, for purposes of the *Gore* guideposts, the conduct at issue falls on the scale of conduct that does or might warrant imposition of punitive damages."

*Id.* In determining where conduct falls on the scale, we begin with the second ratio guidepost and consider the reprehensibility and "other sanctions" guideposts to determine the appropriate limit. Indeed,

> "as a practical matter, the 'ratio' guidepost serves as a sort of benchmark. Although fact-matching can be a fool's errand, cases involving roughly analogous circumstances, particularly with respect to 'reprehensibility' variables, should yield roughly similar ratios of compensatory and punitive damage awards."

*Id.* at 273 (internal quotation marks and citations omitted).

     In accord with that, *Goddard* and *Vasquez-Lopez*, two punitive damage decisions involving purely economic harm, provide some "roughly analogous" context for our analysis. In *Goddard*, the Supreme Court determined that a four-to-one ratio "at the outside limits" was permissible. 344 Or at 275. In that case, although the plaintiff's compensatory damages were not insubstantial at $690,619 plus prejudgment interest, the defendant's conduct was "very reprehensible," *id.* at 268, and the comparable civil sanctions were "relatively severe," particularly considering that each instance of the defendant's repeated conduct would have amassed an individual penalty. *Id.* at 271-72. Further, the court observed:

> "Several reasons influence our choice, but the primary one is the degree of defendant's betrayal of its obligation to protect [its insured]. The drumbeat march of defendant's disregard for [the insured]'s interests began with [the

insured]'s initial claim and persisted, despite the most obvious reasons that it should end, through the calamitous verdict against him. There may be possible courses of behavior in the area of economic wrong that would be even worse, but none leaps to mind. This case fully justifies the highest permissible award, *viz.*, an award that is four times the amount of plaintiff's actual and potential harm * * *."

*Id.* at 275-76.

In contrast, in *Vasquez-Lopez*, the defendants were predatory lenders who fraudulently induced the plaintiffs to borrow money at extremely disadvantageous rates and lied about what their monthly payments would cover. 210 Or App at 556. In that case, the jury awarded the plaintiffs $31,639 in compensatory damages and $500,000 in punitive damages. The trial court, relying on *Campbell*, reduced the punitive damages by roughly half, or from a 15-to-1 ratio to a 7.5-to-1 ratio. *Id.* at 581-82. We first determined that the plaintiffs' actual and potential damages were $326,751 and designated that amount as the proper denominator for calculating the permissible punitive damages, thus making the ratio of the $500,000 in punitive damages that the jury awarded to the potential damages roughly 1.5 to 1. *Id.* at 585. Further, we determined that the defendant's conduct was of "moderate" reprehensibility in light of our finding that two reprehensibility factors—financially vulnerable plaintiffs and intentional malice, trickery, or deceit—were present and, as such, a 1.5-to-1 ratio of potential damages to punitive damages was permissible. *Id.* at 586. Additionally, the defendant's conduct implicated substantial criminal sanctions, including imprisonment and six-figure fines. *Id.* at 587-88.

Here, as in *Vasquez-Lopez*, two reprehensibility factors are present and defendant's conduct was only moderately reprehensible. We have no basis to compare legislative sanctions, since the action here appears to be the sanction designated by the legislature. Based on those factors alone, the ratio of compensatory damages to punitive damages cannot approach the "outer limit" of four to one in *Goddard*, where the conduct was "very reprehensible" and sanctions warranted a substantial punitive award. Rather, defendant's conduct here is more in line with the lower ratio of two to one,

similar to the ratio that we concluded was "appropriate" in *Vasquez-Lopez*.

However, as noted above, an additional factor warranting a higher ratio is present here: a low award of economic damages. The presence of that factor supports a ratio somewhat higher than the four-to-one general limit set by the court in *Goddard*. Balancing that consideration with our conclusion that a roughly two-to-one ratio is appropriate in light of *Goddard* and *Vasquez-Lopez*, we conclude that the permissible award of punitive damages under the circumstances here is four times the amount of plaintiff's compensatory damages, which is $6,000 plus prejudgment interest. On remand, the trial court should calculate the precise amount of prejudgment interest, and accordingly, the maximum permissible punitive damage award, and present that amount to plaintiff as the maximum punitive damage award that, on this record, due process will permit. Then, the court should grant defendant's motion for a new trial, unless plaintiff agrees to entry of an amended judgment that reduces the punitive damage award to that amount.

Judgment vacated and remanded with instructions to grant defendant's motion for a new trial limited to punitive damages, unless plaintiff agrees to remittitur of punitive damages to four times the compensatory damage award.