Argued and submitted July 28, 2008, judgment and supplemental judgment vacated with instructions to grant Farmers' motion for new trial limited to punitive damages, unless plaintiffs agree to remittitur of punitive damages to four times their compensatory damages and prejudgment interest; otherwise affirmed May 20, 2009

Mark STRAWN,
on his own behalf
and as representative of a class of
similarly situated persons,
*Plaintiff-Respondent,*

*v.*

FARMERS INSURANCE COMPANY OF OREGON,
an Oregon stock insurance company;
Mid-Century Insurance Company,
a foreign corporation;
and Truck Insurance Exchange,
a foreign corporation,
*Defendants-Appellants,*

*and*

FARMERS INSURANCE GROUP INC.,
a foreign corporation,
*Defendant.*

Multnomah County Circuit Court
990809080; A131605

209 P3d 357

James N. Westwood argued the cause for appellants. With him on the opening brief were Matthew J. Kalmanson and Stoel Rives LLP, and Michael D. Hoffman, Mark Elgin Olmsted and Hoffman Hart & Wagner LLP. With him on the reply brief were P. K. Runkles-Pearson and Stoel Rives LLP,

Michael D. Hoffman and Hoffman Hart & Wagner LLP, and Mark Elgin Olmsted and Mark E. Olmsted, P.C.

Kathryn H. Clarke and Richard S. Yugler argued the cause for respondent. With them on the brief were David N. Goulder, Lisa T. Hunt, and Landye Bennett Blumstein LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

## SERCOMBE, J.

This class action arises out of defendants' claims handling process with respect to the payment of personal injury protection (PIP) benefits to their insureds. In short, defendants Farmers Insurance Company of Oregon, Mid-Century Insurance Company, and Truck Insurance Exchange (collectively, "Farmers") used cost-containment software to evaluate their insureds' medical expenses in relation to other bills for the same procedure in a given region. If Farmers determined that the charge submitted by an insured's provider exceeded a certain percentage of the range of the charges in those other bills, Farmers refused to pay the excess on the ground that it was "unreasonable." Plaintiff is the representative of a class of insureds who alleged that Farmers' review process set an arbitrarily low percentage (initially, 80 percent) that resulted in the denial of claims for reasonable medical expenses, thereby increasing Farmers' profits at the expense of PIP claimants and medical providers.

On behalf of the class, plaintiff brought claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and declaratory relief. The first three of those claims were tried to a jury, which found in plaintiffs' favor and awarded $1.5 million in compensatory damages and prejudgment interest, and $8 million in punitive damages on the fraud claim. Based on the jury's answer to a special interrogatory, the court ruled in plaintiffs' favor on the request for declaratory relief. After a post-verdict claims administration process, the court entered judgment for plaintiffs in the amount of $898,323.80 for compensatory damages and prejudgment interest, $8 million in punitive damages, and more than $2.6 million in attorney fees. Farmers appeals that judgment and a supplemental judgment that awarded additional attorney fees. For the reasons that follow, we conclude that the jury's punitive damages award must be reduced but otherwise affirm.

## I. BACKGROUND

Because the jury found in favor of plaintiffs, we state the facts in the light most favorable to them. *Taylor v. Ramsay-Gerding Construction Co.*, 345 Or 403, 406, 196 P3d

532 (2008). Since the early 1970s, Oregon law has mandated that PIP benefits be included in every motor vehicle policy issued in Oregon that covers private passenger motor vehicles. By statute, PIP benefits consist of payments for "[a]ll reasonable and necessary expenses of medical, hospital, dental, surgical, ambulance and prosthetic services incurred within one year after the date of the person's injury, but not more than $15,000 in the aggregate for all such expenses of the person." ORS 742.524(1)(a). Accordingly, Farmers' motor vehicle policies included provisions that entitled its insureds to PIP benefits for "reasonable and necessary" medical expenses resulting from the use, occupancy, or maintenance of an insured vehicle.

Before 1998, Farmers processed requests for PIP benefits by having its claims adjusters review each medical bill to determine whether the bill was reasonable—that is, whether it was both "usual and customary." In 1997, however, Farmers decided to change that process. In an effort to recover losses and regenerate its surplus after the 1994 Northridge, California earthquake, Farmers instituted its "Bring Back a Billion" campaign. Farmers' corporate headquarters in Los Angeles alerted its regional offices of the "increasing importance" of generating money without raising premiums. In June 1997, Farmers instructed its Portland office to reduce payment of PIP benefits to realize "PIP dollar savings * * *[,] an untouched area."

In an effort to reduce PIP payments, the Oregon PIP claims manager, Heatherington, contracted with Medical Management Online (MMO), a bill review vendor. MMO, in turn, licensed a "cost containment software program" from Medata, a company that manages a database of roughly 100 million medical expenses. The software sorts those medical expenses by Current Procedural Terminology (CPT) codes, geographic region, and price. CPT codes, which are created by the American Medical Association, are used by medical providers to bill insurers.[1] Geographic regions in the database are defined according to "PSRO" areas, which are sociodemographic regions established by the federal government

---

[1] There are approximately 80,000 - 90,000 different CPT codes.

in 1980 for workers' compensation purposes.[2] For Oregon, the federal government identified two PSRO areas: (1) the Portland-metro area and (2) the rest of the state.

The software allowed MMO's clients (mostly insurance companies and state agencies) to determine whether a bill from a medical provider was more expensive than a given percentage of the range of charges in other bills for the same CPT code in the provider's designated geographic area. Clients were able to select any percentile that they wished, and MMO then evaluated the bills that it received from the client to determine whether the bills exceeded that percentile. If a bill exceeded the preselected percentile, MMO generated an Explanation of Benefits (EOB) form that reduced payment with reference to "reason code" "RC40."[3] The EOB explained the code as follows:

"RC40: This procedure was reduced because the charges exceeded an amount that would appear reasonable when the charges are compared to the charges of other providers within the same geographic area."

The software was promoted as reducing medical provider payments by 26 percent.

Beginning in January 1998, Farmers implemented its new PIP handling process through MMO—a process that, in Heatherington's words, represented "a significant change in the way we handle our bills." Farmers selected the eightieth percentile as the cutoff point for "reasonable" expenses. That is, Farmers determined that any bills that exceeded the eightieth percentile in the MMO database would be deemed to exceed the "reasonable" charge and would be "reduced" to that eightieth percentile. The program worked as follows: After Farmers' insureds were treated for their injuries, their medical providers sent their bills directly to Farmers.

---

[2] The federal government no longer uses the PSRO designations.

[3] A different code, "B2," was used if there were not enough data to determine the percentile for a particular region. The database reverted to a different formula in that instance. In a footnote in the recitation of facts in its opening brief, Farmers contends that plaintiffs did not distinguish between reductions based on B2 codes and those based on RC40, thereby "impermissibly expand[ing] the 'class' beyond the scope of the pleaded claims." Farmers does not develop that argument, and we do not discuss it further.

Farmers then forwarded the bills to MMO, and MMO entered the bills into its database. If the bill was more than the charge that was at the eightieth percentile of the charges for that same CPT code in the designated region, MMO documented that fact on an EOB form with an RC40 code.

Although Farmers contended at trial (and still contends[4]) that the EOB form constituted only a "recommendation" from MMO as to reasonableness, claims adjusters were expected to follow the recommendation. The adjusters were downgraded if they departed from MMO's recommendations and were rewarded when they followed them. Thus, the "recommendation" was, as a practical matter, the final determination of reasonableness.

Between January 26, 1998 and July 21, 1999 (the class period), Farmers reduced more than 60,000 individual bills by a total of approximately $750,000. The majority of the individual reductions were small: 90 percent were for $25 or less; more than one quarter were for $3 or less. Although Farmers offered medical providers an opportunity to justify the charges that exceeded the established percentile, it was generally not cost-effective for medical providers to pursue those avenues. The medical providers who took advantage of the opportunity to justify their charges rarely secured any additional payment from Farmers. When the providers were unable to secure full payment from Farmers, the insureds became responsible for the unpaid amounts.

As previously noted, Farmers selected the eightieth percentile as the cutoff point for payment of "reasonable" charges. That cutoff point, though profitable for Farmers, also yielded an increase in customer complaints. The complaints were particularly problematic for Heatherington and Reinhardt, a regional claims manager, because customer service satisfaction was one of the components for measuring their performance and compensation. Together, Heatherington and Reinhardt decided that the percentile should be raised to see whether customer relations would improve, and, on

---

[4] On this point, our standard of review requires that disputes as to the evidence be resolved in plaintiffs' favor.

May 21, 1999, Farmers raised the cutoff point to the ninetieth percentile. Three weeks before this class action case was filed, Farmers increased the cap to the ninety-ninth percentile. Reinhart reported to corporate headquarters that this was the right tack to take "while the litigation is pending."

Plaintiff Strawn initiated this class action against Farmers in August 1999. In May 2000, the trial court issued an order that granted plaintiffs' motion for class certification, and the case was tried as a class action in November 2003 on plaintiffs' third amended complaint. That complaint alleged four claims for relief: (1) breach of contract; (2) breach of an implied covenant of good faith and fair dealing; (3) declaratory judgment that Farmers' practice of denying charges in excess of the eightieth and ninetieth percentiles violated the requirement to pay "reasonable" medical expenses under ORS 742.524(1)(a); and (4) fraud. The jury returned a verdict in favor of plaintiffs on the breach of contract, breach of an implied covenant, and fraud claims. The jury awarded plaintiffs $757,051.33 in compensatory damages, $742.948.67 in prejudgment interest, and $8 million in punitive damages. The court later entered an order granting plaintiffs' request for declaratory relief, based on the jury's response to a special interrogatory.

After the jury returned its verdict, the trial court conducted a claims administration process to determine the "nature of the loss, injury, claim, * * * or damage" to individual class members and to distribute the jury award among those class members who submitted claims. ORCP 32 F(2). During that claims administration process, Farmers disputed individual claims, and, at the end of the process, the trial court reduced the compensatory award to $607,734.40 and prejudgment interest to $290,589.40. The punitive damages award, however, remained at $8 million. Subsequently, the trial court awarded plaintiffs approximately $2.8 million in attorney fees. This appeal followed.

## II. ANALYSIS

A. *First and Second Assignments of Error*

On appeal, Farmers advances eight assignments of error spanning nearly every stage of the case—from the

court's order granting class certification, through trial and post-verdict proceedings, to the award of attorney fees. The first two assignments involve class certification and the denial of Farmers' directed verdict motion, and Farmers has combined its argument on the assignments. In that combined argument, Farmers first argues that the action should not have been maintained as a class action because each of plaintiffs' claims required individualized proof not conducive to class treatment. Second, Farmers contends that a directed verdict should have been granted in its favor on the various claims because plaintiffs never offered that individualized proof and could not make out a claim for fraud in any event. We understand Farmers' combined argument to raise the following four issues: (1) whether class members were required to, and did, offer particularized evidence that individual charges were "reasonable"; (2) whether plaintiffs were required to, and did, offer evidence of particularized injury; (3) whether a claim for fraud is cognizable on these facts; and (4) whether plaintiffs offered sufficient evidence that they relied on a purported misrepresentation by Farmers. We address each of those issues in turn.

### 1. *Individualized proof of "reasonableness"*

The gravamen of plaintiffs' claims in this case is that, by implementing a PIP claims handling process based on preset percentiles, Farmers broke its promise to pay "reasonable" PIP-related medical expenses to its insureds pursuant to ORS 742.524(1)(a). According to Farmers, "[i]t is undisputed that the class members' diverse medical expenses involved different procedures for different injuries, that were performed by different providers at different times and in different locations." For that reason, Farmers contends that the case was not appropriate for class certification and its motion for a directed verdict should have been granted as to each of plaintiffs' claims.

In its opening brief, which was filed in January 2007, Farmers contended that this court's decision in *Ivanov v. Farmers Ins. Co.*, 207 Or App 305, 140 P3d 1189 (2006), "a remarkably similar case, is on point." That case, too, involved Farmers' use of MMO's software to evaluate PIP claims. In *Ivanov*, Farmers denied payment to its insureds for certain

PIP-related expenses on the ground that the expenses were not reasonable and necessary. *Id.* at 310. The insureds asserted claims for "breach of contract, fraud, breach of the implied covenant of good faith and fair dealing, tortious breach of good faith, and intentional interference with contractual relations." *Id.* at 308. They also sought a declaration that "Farmers may not deny [PIP] benefits to its insureds solely on the basis of generalized criteria not specific to claimants' injuries[.]"[5] The trial court granted summary judgment in favor of Farmers, concluding that the insureds had the burden of proving that their PIP-related expenses were reasonable and necessary and that they had not demonstrated a material factual dispute on that question at the summary judgment stage. *Id.* at 309. We affirmed on narrower grounds, concluding that, in the absence of expert testimony about the expenses, the plaintiffs had failed to produce "evidence from which a trier of fact could infer that the claimed expenses were necessarily incurred." *Id.* at 317.

Subsequently—and after the parties had completed their briefing in this case—the Supreme Court reversed our decision in *Ivanov*. *Ivanov v. Farmers Ins. Co.*, 344 Or 421, 185 P3d 417 (2008). Before the Supreme Court, Farmers argued that the plaintiffs could not challenge its PIP claims processing practices unless the plaintiffs could "first demonstrate, in response to Farmers' summary judgment motion, that their claimed medical expenses were necessary. Specifically, Farmers assert[ed], as it did before the trial court and the Court of Appeals, that plaintiffs' medical bills alone are insufficient to establish the requisite proof of medical necessity." *Id.* at 428. The Supreme Court rejected Farmers' argument as well as its framing of the issue:

> "Farmers' argument in that regard, however, and its framing of the issue to be decided on summary judgment, are both premised on a faulty reading of ORS 742.524(1)(a). ORS 742.524(1)(a) creates a presumption that PIP-related claims for medical expenses submitted by a healthcare provider are reasonable and necessary at the time that they

---

[5] The plaintiffs also sought a declaration that "Farmers may not deny [PIP] benefits to [its] insureds * * * unless [the] determination is based on a contemporaneous physical examination [IME] of the insured by a physician selected by Farmers." That aspect of *Ivanov* is not pertinent to our discussion.

are submitted to an insurer. The effect of such a presumption is set forth in ORS 40.120, which provides:

> " 'In civil actions and proceedings, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.'

"Consequently, we believe that it follows that the presumption established by the legislature in ORS 742.524(1)(a) attaches to PIP claims at their inception and, once established, functions as any other civil presumption, *i.e.*, it shifts the burden of proof to the party against whom it is directed—in this case, the insurer. That means that the legislature intended that, under ORS 742.524(1)(a), the presumption would operate as follows: When a healthcare provider submits a PIP claim for medical expenses on behalf of an insured, the expenses are presumed to be reasonable and necessary. An insurer may issue a timely denial of a claim to a provider and, once it does so, the expenses are no longer entitled to that presumption. However, it is not the validity of Farmers' claim *denials* that plaintiffs seek to challenge in this action. Instead, plaintiffs challenge the sufficiency of Farmers' investigation of their claims *before* Farmers' issued its denials, *i.e.*, they challenge Farmers' actions or lack thereof at the time the claims were presumed medically reasonable and necessary."

*Ivanov*, 344 Or at 429 (footnote omitted; emphasis in original).

The court further explained that the "obligation of good faith performance and enforcement applies equally to the contractual relationship that exists between Farmers and its insureds seeking their contractual and statutory PIP benefits." *Id.* at 430. The court then identified a related statute that prohibits insurers from denying payment of claims without first conducting a "reasonable investigation" of those claims:

> "In that regard, ORS 746.230(1) provides, in part:

> " 'No insurer or other person shall commit or perform any of the following unfair claim settlement practices:

> " '* * * * *

" '(d) Refusing to pay claims without conducting a reasonable investigation based on all available information[.]'

"(Emphasis added.) Under that statute, an insurer is obligated to conduct a 'reasonable investigation' sufficient to support a decision to deny a medical expense claim that is statutorily 'presumed to be reasonable and necessary.' Obedience to that prohibition is a component of Farmers' good faith obligation in this context."

*Ivanov*, 344 Or at 430.

In light of that obligation—and the plaintiffs' focus on the claims review process—the Supreme Court concluded that this court and the trial court had erred in assigning to the plaintiffs the initial burden of establishing medical necessity:

"At the time that Farmers was processing the medical claims at issue here, those claims were presumed to be medically necessary; as a result of that presumption, plaintiffs were not responsible for establishing medical necessity at that point in time. *Consequently, because the gravamen of plaintiffs' complaint was that Farmers' review methodology was an impermissible one, Farmers needed to establish that the procedures it employed to deny plaintiffs' claims satisfied its statutory and common-law duties and did not violate the prohibition set out in ORS 746.230(1)(d)."*

*Id*. at 430-31 (emphasis added).

■ In our view, *Ivanov* defeats Farmers' contention that plaintiffs failed to offer sufficient proof of the reasonableness of their medical expenses. In this case, as in *Ivanov*, the "gravamen of plaintiffs' complaint was that Farmers' review methodology was an impermissible one." *Id*. at 430. Thus, plaintiffs were not required to offer any additional evidence that, at the time the bills were submitted, they were reasonable; the expenses were presumptively reasonable at that point. Instead, Farmers had the burden of establishing that "the procedures it employed to deny plaintiffs' claims satisfied its statutory and common-law duties." *Id*. For that reason, the trial court did not err in denying Farmers' motion for a directed verdict regarding proof of reasonableness, an issue on which plaintiffs enjoyed a statutory presumption.

Farmers' related contention—that the class should have been decertified because plaintiffs were required to offer *individualized* proof of reasonableness—fails for the same reason; each class member was entitled to the same presumption.[6]

## 2. *Individualized proof of injury*

Farmers next argues that the class should have been decertified, and Farmers' motion for a directed verdict granted, because plaintiffs could not prove that each class member was injured by Farmers' claims review process. According to Farmers, an insured has not "incurred" medical expenses—and is therefore not injured—unless and until the insured is "out of pocket" for those expenses. In support of that proposition, Farmers relies on the Supreme Court's observation that the PIP statutes were created "to provide, promptly and without regard to fault, reimbursement for some *out-of-pocket losses* resulting from motor vehicle accidents." *Perez v. State Farm Mutual Ins. Co.*, 289 Or 295, 300, 613 P2d 32 (1980) (emphasis added). Plaintiffs, meanwhile, contend that they suffered loss when Farmers refused to pay expenses that had been *billed* by medical providers, thereby subjecting plaintiffs to liability for those charges.

■ In our view, Farmers' stance regarding injury and "out-of-pocket" loss in this case is overly restrictive and somewhat circular. The description of "out-of-pocket" losses in *Perez* did not refer only to situations in which insureds had already paid the medical bills from their providers; it simply used that term to distinguish between medical expenses incurred as the result of the accident and the lost wages that the insured's beneficiaries were seeking in *Perez. Id.* (differentiating between "out-of-pocket loss" and lost wages to survivors of the accident). As plaintiffs correctly point out, if insureds do not "incur" medical expenses under the PIP

---

[6] In a memorandum of supplemental authorities, Farmers contends that *Ivanov* (specifically, the concurring opinion in that case) supports its contention that the class should not have been certified, because of differing methods of claim review. The differing claims review methods in *Ivanov* appear to have been far more varied than in this case. *See* 344 Or at 433 (Balmer, J., concurring). We are not convinced that any of the differences in this case—including the differing percentile cutoff points—make it inappropriate for class treatment.

statutes until they have already paid their bills, why would the PIP reimbursement scheme contemplate direct billing by medical providers to insurers and other communications between providers and insurers? *See* ORS 742.524(1)(a) (providing that expenses are presumed reasonable and necessary "unless *the provider is given notice of denial* of the charges not more than 60 calendar days after *the insurer receives from the provider notice of the claim for the services*" (emphasis added)). The PIP scheme plainly contemplates that insurers will be required to pay PIP benefits when the insured becomes legally obligated to pay the medical expenses, whether the insured has already discharged that obligation or not. Thus, we reject Farmers' premise that plaintiffs were required to prove that they actually paid the medical expenses that Farmers denied as unreasonable.[7]

■ Next, Farmers contends that certain plaintiffs were not injured because they received compensation from third-party tortfeasors and that, under the PIP statutes, plaintiffs would have been required to reimburse Farmers for any PIP payments out of any third-party recovery. *See* ORS 742.536. Reimbursement of PIP insurers, however, is a separate aspect of the PIP scheme, and insurers must follow certain procedures to obtain that reimbursement. *See, e.g.*, *Farmers Ins. Co. v. Conner*, 219 Or App 337, 182 P3d 878, *rev den*, 345 Or 94 (2008); *Gaucin v. Farmers Ins. Co.*, 209 Or App 99, 146 P3d 370 (2006). Farmers offers no principled explanation as to why plaintiffs would have had the burden *to refute* Farmers' potential entitlement to reimbursement of benefits that were never paid in the first place.[8]

---

[7] In a related vein, Farmers argues that plaintiffs could not have been injured by its refusal to pay certain medical expenses because "patients who receive PIP benefits have no obligation to pay 'unreasonable' medical bills." That argument assumes, of course, that the medical bills were "unreasonable"—an assumption that cannot be made on this record in light of the statutory presumption of reasonableness.

[8] Farmers' final argument regarding proof of injury is that plaintiffs' evidence established only that "the list of charges submitted to the jury had been *recommended* for reduction by the bill review vendor." (Emphasis added.) As we noted earlier, 228 Or App at 460 n 4, Farmers' factual premise—that the bills were only *recommended* for reduction—is not viable in light of our standard of review. Plaintiffs' evidence, when viewed in the light most favorable to them, established that the "recommendation" was more than that.

### 3. *Failure to state a claim for fraud*

The remainder of Farmers' first two assignments of error pertains to plaintiffs' fraud claim. Initially Farmers contends that its duties are statutory and contractual, the breach of which does not sound in tort. Specifically, Farmers argues that plaintiffs "pleaded fraud in Farmers' breach of the insurance policies, not in their inducement. No 'special relationship' in this case gives rise to a standard of care independent of the terms of the contract."

Plaintiffs, in response, argue that Farmers did not preserve that issue. In reply, Farmers does not contend that it made any such argument as part of its directed verdict motion or as part of its motion to decertify the class; rather, it directs the court to summary judgment proceedings (that are not the subject of any assignment of error) and, alternatively, contends that the "legal point is so obvious as not to be subject to dispute, qualifying the trial court's error of law in any event as one apparent on the face of the record."

■ We agree with plaintiffs that Farmers failed to preserve its contention that the trial court should have granted a directed verdict or decertified the class on the basis that plaintiffs failed to state a claim for fraud. Moreover, we are not persuaded that the unpreserved claim of error qualifies as error apparent on the face of the record under ORAP 5.45. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (error is apparent on the face of the record for purposes of ORAP 5.45 if (1) the error is one of law, (2) the legal point is obvious, that is, not reasonably in dispute, and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it").

■ Farmers' underlying premise—that plaintiffs' fraud claim is based on a breach of contract theory rather than fraud in the inducement—is itself open to reasonable debate. When instructing the jury with regard to the fraud claim, the trial court explained:

> "Now, a promise to do something in the future, that is either made, one, with [*sic*] the intent to perform in the future or, two, made with reckless disregard as to whether

the promise will be performed in the future may be a misrepresentation."

That language is drawn from cases involving "promissory fraud" or "fraud in the inducement," *i.e.*, cases in which false promises were made to induce another to act or refrain from acting. *See Elizaga v. Kaiser Found. Hospitals*, 259 Or 542, 548, 487 P2d 870 (1971) ("A failure to perform a promise is not a basis for an action for fraud. Making a promise, however, with the knowledge that it probably cannot be performed or with reckless disregard whether the promissor can or cannot perform can be the basis for an action of fraud."). Here, plaintiffs assert that Farmers continued to collect insurance premiums knowing that it did not intend to pay reasonable medical expenses as it had promised; whether plaintiffs' theory of fraud is actionable, in light of the jury instructions and evidence in this case, is at the very least subject to reasonable dispute. Accordingly, we reject Farmers' unpreserved contention that plaintiffs failed to state an actionable claim for fraud.

### 4. *Proof of reliance*

Farmers' final argument under its first two assignments of error is that plaintiffs were required to present evidence that each member of the class relied on Farmers' misrepresentation regarding the payment of PIP benefits and that plaintiffs failed to present that proof. According to Farmers, the trial court actually eliminated the element of reliance altogether, "ruling that class members did not need to establish reliance because there was evidence of 'omissions' and 'half-truths.' "

Farmers' characterization of the trial court's ruling, however, is not supported by the record. In response to Farmers' motion for a directed verdict, plaintiffs' counsel made the following argument regarding reliance:

> "When you have omissions here—these are omission cases, so we don't need to prove that you acted in a particular way. *We have omissions, and we have people refraining from acting because of the misrepresentations being made here, and there are a variety of them.*

"They are told that this is a, quote, recommendation made by an independent bill review service. It's not disclosed that what this really is is Farmers setting the percentile. It's not really a recommendation at all. It's a business practice, to follow it, and Farmers set the business practice.

"Providers are being told you're charging more than eight out of ten people. Whoa. That's going to have a different impact—it has a different impact on policyholders than if they are told the truth."

(Emphasis added.) At that point in the argument, the trial court stated, "I agree with that." After the parties had concluded their arguments, the court issued its oral ruling on the directed verdict motion, further explaining its reasoning regarding reliance:

"Defendants contend that plaintiffs have failed to prove that all of the class members relied on material misrepresentation by defendants. And I deny the motion on that ground. *The—there are omissions and nondisclosures of material fact that are involved here. There are—looking at plaintiffs' evidence in the light most favorable to plaintiffs, there were half-truths involved here, again, using the same standard which the jury could choose to believe that evidence. So the defendant's motion fails on that ground.*"

(Emphasis added.) Thus, the court did not, as Farmers contends, dispense with the element of reliance. Rather, the court ruled that the evidence, viewed in the light most favorable to plaintiffs, created a jury question on that issue.

■ We agree with the trial court's view of the evidence. We are not aware of, nor has Farmers cited, any case law that requires *direct* evidence of reliance in support of a fraud claim.[9] Here, plaintiffs offered evidence that, viewed in the light most favorable to plaintiffs, established that Farmers (1) promised to pay all reasonable and necessary medical

---

[9] *See Vasquez v. San Juan County,* 4 Cal 3d 800, 814, 484 P2d 964, 972 (1971) ("The rule in this state and elsewhere is that it is not necessary to show reliance upon false representations by direct evidence. The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect." (Internal quotation marks omitted.)).

expenses as part of its PIP coverage; (2) selected an arbitrary percentile cutoff that would increase its profits at the expense of insureds; and (3) continued to collect premiums from its insureds without informing them that it had decided not to pay all reasonable and necessary expenses. From that evidence, a reasonable trier of fact could conclude that the payment of reasonable and necessary PIP-related expenses was a material part (and, in fact, a statutorily required part) of the insurance policy and could therefore reasonably infer that plaintiffs relied on Farmers' misrepresentation that it would pay reasonable and necessary PIP-related expenses when they continued to pay their premiums. That is, on this record, a reasonable trier of fact could conclude that plaintiffs acted to their detriment in paying premiums for PIP coverage that Farmers never intended to provide. *Cf.* Richard A. Lord, 27 *Williston on Contracts* § 69:32, 12 (4th ed 2003) ("Where representations have been made in regard to a material matter and action has been taken, in the absence of evidence showing the contrary, it will be presumed that the representations were relied on."); *Restatement (Second) of Contracts* § 167 comment b (1981) (where fraud or misrepresentation is material with reference to a transaction subsequently entered into, "it is assumed in the absence of facts showing the contrary, that the recipient attached importance to the truth of a misrepresentation"). The trial court did not err in denying Farmers' motion for a directed verdict on the issue of reliance.

■ Nor has Farmers explained how the evidence of reliance would differ from class member to class member in this case; the same misrepresentations were made to each member of the class. Thus, we are not persuaded that the trial court was required to decertify the class because of individual questions regarding reliance.[10]

---

[10] Throughout its briefing, Farmers cites cases from federal courts that have considered class certification issues in similar cases involving payment of PIP benefits. Those cases, which were decided under the Federal Rules of Civil Procedure, are of limited value to us because of the difference between FRCP 23, the federal rule governing class certification, and ORCP 32. *See Shea v. Chicago Pneumatic Tool Co.,* 164 Or App 198, 206-07, 990 P2d 912 (1999), *rev den*, 330 Or 252 (2000) (discussing the differences between Oregon and federal law regarding the predominance of common questions of law and fact as prerequisites for class certification). Apart from noting that federal courts have often elected not to certify these types of cases, Farmers does not explain why the same result obtains under ORCP 32.

For the reasons stated above, we reject Farmers' first and second assignments of error.

## B. *Third assignment of error*

In its third assignment of error, Farmers argues that the trial court "refus[ed] to allow Farmers to present individual defenses" to plaintiffs' claims. Essentially, Farmers contends that the trial court denied it the opportunity to (1) present evidence of provider write-offs and third-party recoveries; and (2) present additional reasons (beyond the percentile classifications) that plaintiff Strawn was not entitled to PIP payment for certain medical expenses.

As Farmers acknowledges, evidentiary error does not automatically result in a new trial. We will not reverse or modify a judgment unless the error has substantially affected the rights of a party. ORS 19.415; OEC 103(1). As to the first issue raised by Farmers—evidence of write-offs and other third-party recovery—the trial court deferred the calculation of damages to a post-verdict claims administration process. As part of that claims administration process, Farmers raised defenses to individual PIP balances, and the trial court reduced the jury's award by $150,000. Farmers has not explained on appeal—either in its opening brief or in reply— how the judgment would have been any different (*i.e.*, reduced any further than it was) had Farmers been allowed to offer evidence of write-offs at an earlier stage in the proceedings. On this record, we have no basis to conclude that the claimed error regarding write-offs and third-party recoveries, if it was error, substantially affected Farmers' rights.[11]

As to the second issue, the trial court excluded evidence that a medical examination of Strawn was "unnecessary" in addition to unreasonable; the court ruled that "Farmers committed itself to certain positions at the time back in—during the class period. So to come up with new denials now does not seem appropriate, and I—I'm not inclined to permit that." That is, the court concluded that

---

[11] As to the issue of write-offs, Farmers, in a memorandum of additional authorities, concedes that this court's decision in *White v. Jubitz Corp.*, 219 Or App 62, 182 P3d 215, *rev allowed*, 345 Or 175 (2008), runs counter to its contention that a plaintiff whose bill has been written off has incurred no damage.

"necessity" (as opposed to reasonableness) was not at issue in the case and that Farmers was "estopped" from raising a new ground for denying payment of the benefits at that point in the case. Given the timing and circumstances of Farmers' proffer, the trial court did not err in excluding that evidence. *Cf. ABCD...Vision v. Fireman's Fund Ins. Companies*, 304 Or 301, 307, 744 P2d 999 (1987) (explaining that "timely disclosure of the reasons for denying a claim can estop the insurer from subsequently denying a claim on other grounds").

C. *Fourth assignment of error*

Farmers' fourth assignment asserts that the trial court erred in requiring Farmers to rebut the presumption under ORS 742.524(1)(a) that the medical expenses were reasonable. As we explained with respect to Farmers' first and second assignments of error, plaintiffs were entitled to that presumption under the reasoning of *Ivanov*. We reject plaintiffs' fourth assignment for the same reason.

D. *Fifth assignment of error*

In its fifth assignment of error, Farmers contends that "the trial court erred in permitting a jury to determine the meaning and application of ORS 742.524(1)(a)." According to Farmers, the court erred in instructing the jury as follows:

> "The court instructed the jury to determine whether 'Farmers breached the insurance contracts by failing * * * to pay all reasonable medical expenses of the class members that exceeded the 80th and later the 90th percentile.' For the implied covenant claim, the court instructed the jury to determine whether Farmers 'breached its duty of good faith and fair dealing * * * by unilaterally refusing to pay for any and all medical expenses usually and customarily charged by providers to plaintiff and class members that exceeded the 80th and later the 90th percentile for such charges as determined by defendants,' contrary to 'the reasonable expectations' of the class members. The court then instructed the jury to assume that all the bills were reasonable and to construe 'any ambiguity of any term' in the policy against Farmers."

(Record citations omitted.) Those instructions, Farmers argues, presented the jury with a legal question:

"The jury was not asked to determine whether individual charges were reasonable. Rather, it was asked to determine whether charge comparison reviews set at the 80th or 90th percentile constituted a *blanket* violation of an insurer's obligation under ORS 742.524(1)(a) to pay 'reasonable' charges—effectively to decide the meaning of a statute."

(Emphasis by Farmers.)

That issue, however, is raised for the first time on appeal. In describing where the issue was preserved, Farmers cites its memorandum in support of summary judgment, in which it asserted that the use of the eightieth and ninetieth percentile review process did not, as a matter of law, violate Oregon statutes or its insurance policies; its directed verdict motion, in which it submitted that plaintiffs' claims were predicated on the question of "reasonableness"; and its objections to certain jury instructions placing the burden on Farmers to prove reasonableness. And yet, in the end, Farmers states that "[t]his assignment involves the trial court's incorrect interpretation and application of ORS 742.524(1)(a)" and that "[p]reservation of error moves to the background when the question is interpretation of a statute by this Court or the Oregon Supreme Court."

Although Farmers stops short of conceding that this assignment of error is unpreserved, Farmers has not demonstrated that it ever argued in the trial court that the question of "reasonableness" under ORS 742.524(1)(a) was an issue of statutory construction for the court and not the jury. Indeed, at trial, Farmers' counsel told the trial court, "We believe it's for the jury to decide whether the medical bills were reasonable." Because it is unpreserved, we decline to address Farmers' argument that the trial court erred in submitting an issue of statutory construction to the jury.

We note that Farmers' fifth assignment of error also raises a number of issues that appear to go beyond the question of whether "reasonableness" under ORS 742.524(1) is a jury matter. In fact, plaintiffs have moved to strike Farmers' fifth assignment of error for that reason. Plaintiffs argue:

"Farmers attempts a broadside attack on multiple trial court rulings, violating ORAP 5.45(2). Some of the rulings attacked aren't assigned as error and aren't mentioned

until argument; Farmers has made no attempt to comply with ORAP 5.45(2) or (4). Many of the rulings do not fit Farmers' statement of the nature of the assignment. Even if Farmers had properly framed separate assignments of error, the rulings involve diverse legal issues and are not suited for combined argument."

In its reply brief, Farmers concedes that its fifth assignment of error is a "clean up" assignment of four interrelated trial court rulings, but urges this court not to "indulge Plaintiffs' exaltation of form over substance."

Farmers' failure to comply with ORAP 5.45 is not simply a technical error. The section of the brief concerning preservation of error and the accompanying argument address multiple rulings that involve different legal issues and different preservation concerns. Thus, we are unable to determine what rulings are being challenged in Farmers' fifth claim of error and whether the bases for those challenges were preserved below. Accordingly, to the extent that Farmers' assignment encompasses something other than the instructional error previously discussed, we also decline to reach those claims of error because they are not adequately framed under our rules of appellate procedure.

### E. *Sixth assignment of error*

In its sixth assignment of error, Farmers contends that plaintiffs' declaratory judgment claim was moot by the time that the trial court entered judgment on that claim. The judgment entered by the trial court, which was based on the jury's verdict, declared that Farmers "use of the 80th and later the 90th percentiles for reduction of medical expenses, in conjunction with its review and appeal process," breached the insurance policies, breached the implied covenant of good faith and fair dealing, and "is and was in violation of ORS 742.524(1)(a)." By the time the court entered that judgment, ORS 742.525 had been enacted. Or Laws 2003, ch 813, § 4. That statute expressly limited provider charges for PIP claimants based on workers' compensation fee schedules for medical, hospital, dental, surgical, ambulance, and prosthetic services—schedules calculated not unlike MMO's percentiles. According to Farmers, that legislation rendered

moot any request for declaratory relief regarding Farmers' previous claims handling process.

The 2003 legislation, by its terms, applied prospectively to policies "issued or renewed on or after" its effective date, January 1, 2004. Or Laws 2003, ch 813, § 5. Thus, any policies issued and not renewed before that date were still governed by the previous version of the statute—and, potentially, the claims handling processes that were the subject of this litigation. Although Farmers submits that it had ceased using the eightieth and ninetieth percentiles to evaluate PIP claims, the evidence demonstrates that it did so with this class action looming. A party's voluntary cessation of a practice under those circumstances does not render an action moot. *Tanner v. OHSU*, 157 Or App 502, 510, 971 P2d 435 (1998) ("The voluntary cessation of a practice that is challenged * * * does not, in itself, render an action moot; if the law were otherwise, wrongdoers could cease their wrongdoing as soon as complaints are filed and resume the wrongdoing as soon as the complaints are dismissed for being moot.").

Moreover, as plaintiffs point out, those individuals who opted out of the class in response to the initial class action notice, as well as class members who did not submit claims forms during the post-verdict claims administration process, all benefitted from the entry of the declaratory judgment. With the declaratory judgment in place, those individuals were left to pursue individual actions against Farmers without first litigating the issues resolved in this class action.

Farmers also challenges the trial court's entry of declaratory judgment on the grounds previously asserted regarding the jury's verdict. We reject that challenge for the reasons stated with respect to Farmers' other assignments of error.

F. *Seventh assignment of error*

Farmers' seventh assignment of error challenges the punitive damages award. To recap, the jury awarded plaintiffs $1.5 million ($757,051.33 in compensatory damages and $742,948.67 in prejudgment interest), as well as $8 million in

punitive damages. After the post-verdict claims administration process, the trial court reduced the compensatory damages award to $607,734.40 and the prejudgment interest award to $290,589.40. The court, however, denied Farmers' request to reduce the punitive damages award.

On appeal, Farmers argues that an $8 million punitive damages award violates its rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[12] The Oregon Supreme Court explained in *Goddard v. Farmers Ins. Co.*, 344 Or 232, 251, 179 P3d 645 (2008):

> "Punitive damages awards that are 'grossly excessive' violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because excessive punitive damages serve no legitimate purpose and constitute arbitrary deprivations of property. *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996). Excessive punitive damages also implicate the requirement of fair notice that is enshrined in the Due Process Clause: Due process dictates that 'a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose.' *Id.* at 574."

Our methodology for reviewing a punitive damages award under the Due Process Clause involves three steps. First, we must determine whether there is a factual predicate for a punitive damages award, reviewing the relevant evidence in the light most favorable to the party who obtained the award. *Goddard*, 344 Or at 261. Second, we examine the predicate facts in light of the three "guideposts" originally set out by the United States Supreme Court in *Gore* for determining whether an award comports with the strictures of due process. Those guideposts are

> " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages

---

[12] Farmers also contends that the punitive damages award must be reversed in its entirety because Farmers was entitled to a directed verdict on the fraud claim, the claim on which punitive damages were awarded. As discussed earlier in this opinion, we reject Farmers' arguments regarding the directed verdict motion.

awarded by the jury and the civil penalties authorized or imposed in comparable cases.' "

*Goddard*, 344 Or at 251 (quoting *State Farm Mut. Ins. Co. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*)). Third, if that examination leads us to conclude that the award is grossly excessive, we must apply those same guideposts to determine the maximum punitive damages award that due process will permit. *Goddard*, 344 Or at 262.

■ Our first task, then, is to determine whether plaintiffs have established the factual predicate for a punitive damages award. Giving them the benefit of all reasonable inferences in this case, we conclude that they have. A reasonable jury could have understood the facts and available inferences in this case to demonstrate that Farmers engaged in a willful pattern of deceit in wanton disregard of the injury that it would cause to its insureds and to medical providers. *See State ex rel Young v. Crookham*, 290 Or 61, 65, 618 P2d 1268 (1980) ("Punitive damages are allowed in Oregon to punish a willful, wanton or malicious wrongdoer * * *.").

Having determined that some award of punitive damages was permissible, we must determine whether the jury's award of $8 million is grossly excessive in light of the three guideposts set out in *Gore*. As the Supreme Court observed in *Goddard*, "[i]t is clear that that analysis must begin, at least, with the aforementioned guideposts * * *. It is less clear how those guideposts can yield a specific numerical figure that represents the maximum constitutionally permissible award." 344 Or at 256-57. The court further observed that the second guidepost—*i.e.*, disparity between punitive damages and the actual or potential harm suffered by the plaintiff—"although far from perfect, does provide at least a *rough* numerical baseline for calculating a maximum constitutionally permissible punitive damages award in a given case." *Id.* at 259 (emphasis in original). "Once that rough numerical reference point is established, the other guideposts come into play." *Id.*

■ We begin our analysis, then, with the second guidepost, which provides a rough numerical reference point. This case involves purely economic harm. "[A]s a very general rule

of thumb, the federal constitution prohibits any punitive damages award that significantly exceeds four times the amount of the injured party's compensatory damages, as long as the injuries caused by the defendant were economic, not physical." *Id.* at 260. That said, a higher ratio of punitive damages to actual or potential harm may be permitted under certain "narrow circumstances," such as "(1) when a particularly egregious act causes only a small amount of economic injury; (2) when the injury is hard to detect; (3) when it is difficult to place a monetary value on noneconomic harms; and (4) when 'extraordinarily reprehensible' conduct * * * is involved." *Id.* at 270. None of those circumstances is present here. Even assuming that Farmers' act was "particularly egregious,"[13] the jury awarded plaintiffs (as a class) substantial compensatory damages for economic injury. Moreover, no claim of noneconomic harm was involved; the harm to plaintiffs is not difficult to detect;[14] and Farmers' conduct "is in no way comparable to [other cases of 'extraordinarily reprehensible' conduct], for example, Philip Morris's 50-year campaign to delude a large part of the population of Oregon about the potentially devastating physical effects of smoking its products." *Id.* Thus, we presume that the maximum constitutionally permissible punitive damages award in this case is

---

[13] That assumption is itself dubious, in light of our prior case law. *Bocci v. Key Pharmaceuticals, Inc.*, 189 Or App 349, 360, 76 P3d 669, *adh'd to on recons*, 190 Or App 407, 79 P3d 908 (2003) (defendant knowingly withholding or misrepresenting information from the FDA and physicians about its product's risks of toxicity were highly reprehensible but did not "rise to the level of 'particularly egregious' " acts justifying a higher ratio). *But see Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 246, 193 P3d 46, *modified as to prevailing party designation*, 227 Or App 165, 205 P3d 70 (2008), *rev allowed*, 346 Or 157 (2009) ("[I]t would appear that, under circumstances where the compensatory damage award can be properly characterized as 'small,' we need not dwell on whether the conduct was 'particularly egregious.' ").

[14] Although plaintiffs' injuries were difficult to detect in the sense that they involved small dollar amounts and deceitful conduct, this case does not appear to present the type of difficult-to-detect injury that the United States Supreme Court envisioned in *Gore* as deserving of a higher ratio. In *Gore*, the Court used "cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine" as examples of cases in which the compensatory award does not adequately account for the actual or potential harm suffered by the plaintiffs. *Gore*, 517 US at 582. Other than generalized statements that insureds suffered stress as the result of Farmers' conduct, plaintiffs do not contend that they suffered any additional injury that cannot be detected or adequately accounted for in a compensatory award.

four times the "actual or potential harm" suffered by plaintiffs.

This case, however, presents an additional question for purposes of determining the appropriate ratio: What is the "actual or potential harm" suffered by plaintiffs? Plaintiffs contend that the "actual or potential harm," the denominator in the ratio, should be $1.5 million, which the jury awarded in compensatory damages and prejudgment interest.[15] Farmers, meanwhile, argues that the ratio's denominator should be $898,323.80, the reduced compensatory damages and prejudgment interest awarded *after* the post-verdict claims administration process. In Farmers' view, the reduced award best represents the actual and potential harm to the class.

As we understand the post-verdict review process in this case, class members and their "assigns" were invited to submit claims forms requesting affirmative relief. According to plaintiffs, "[i]f Farmers established a defense to a particular PIP balance presumptively owed, the class member's recovery from the common fund was reduced or barred." If the class member did not return the claim form, the class member's claims were "dismissed without prejudice to the right to maintain an individual, but not a class action, for such claim." Given that the jury's determination of compensatory damages and prejudgment interest included claims (a) to which Farmers had a defense or (b) that were ultimately dismissed, we conclude that the amount of compensatory damages and prejudgment interest reduced to judgment represents the "actual or potential harm" to the class members in this case. Using that figure—$898,323.80—the ratio between punitive damages and actual or potential harm in this case is approximately nine to one, more than twice the presumptive permissible ratio for cases involving only economic harm.

■ Having identified the presumptive permissible ratio, we return to the other two guideposts to determine whether a departure from the presumptive ratio is otherwise permitted.

[15] *See Goddard*, 344 Or at 269-70 (actual and potential harm includes accrued prejudgment interest).

Again, the first guidepost requires us to assess "the degree of reprehensibility of the defendant's misconduct." *Campbell*, 538 US at 418. We consider several "aggravating factors" as part of that assessment, including whether

> "the harm caused was physical as opposed to economic; whether the tortious conduct evinced indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; whether the conduct involved repeated actions; and the harm was the result of intentional malice, trickery, deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."

*Goddard*, 344 Or at 253 (internal quotation marks and citations omitted).

Once more, viewed in the light most favorable to plaintiffs, the evidence established that Farmers intentionally engaged in a pattern of misrepresentation designed to increase its profits at the expense of its insureds. Thus, in this case, two of the *Gore* factors are present: First, the harm involved repeated actions over the course of the class period; second, the harm was the result of "intentional malice, trickery, [or] deceit" rather than mere accident.

Our qualitative assessment of those two *Gore* factors is informed by our analysis of the first guidepost in *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 239-40, 193 P3d 46, *modified as to prevailing party designation*, 227 Or App 165, 205 P3d 70 (2008), *rev allowed*, 346 Or 157 (2009)— a case, like this one, involving only economic loss:

> "Oregon courts have had several opportunities to apply those factors in cases where, as here, the plaintiffs sustained only financial harm. Most recently, *Goddard* involved an employee of the defendant insurer who engaged in extensive and repeated 'stonewalling' and 'low-balling' during claims evaluation and settlement processes that exposed its insured to a 'devastating' verdict in a no-defense case. 344 Or at 262. The Supreme Court described the defendant's actions as 'very reprehensible,' *id.* at 268, and found that three *Gore* factors were present: the defendant knew of the plaintiff's financial vulnerability, the evidence

indicated a 'modest level of "repeated action" ' by the defendant against both the insured in that case as well other insureds, and the defendant acted with 'malice, *i.e.*, intentionally, without just cause or excuse, in its dealings with [the insured].' *Id.* at 266-67.

"A case that we decided before the Supreme Court affirmed *Goddard, Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or App 553, 152 P3d 940 (2007), involved a misrepresentation claim in connection with a loan made by the defendant's employee to the plaintiffs. We described that case as one of 'only moderate reprehensibility,' *id.* at 586, where only two of the *Gore* factors were present: the plaintiffs were financially vulnerable, and the defendant engaged in intentional trickery and deceit. There, the defendant's employee lied to the plaintiffs to convince them to abandon their existing loan for a significantly less advantageous one. As a consequence of the defendant's conduct, the plaintiffs suffered financial loss as well as 'anxiety about the apparently potential repossession of their home.' *Id.*"

*Hamlin* involved a defendant's refusal to reinstate one of its employees after an on-the-job injury. The facts, we concluded, supported the conclusion that the defendant had acted with intentional malice in refusing to reinstate the plaintiff. In assessing the reprehensibility of the defendant's actions, we explained that "the first two factors—physical harm and indifference to or reckless disregard of others' health or safety—are not in play, although the absence of those factors is not unusual where the harm at issue is strictly financial." 222 Or App at 240 (citing *Goddard*, 344 Or at 268, for the proposition that "cases of economic harm * * * seldom provide malefactors with an opportunity" to satisfy the criteria of the first two *Gore* "aggravating factors"). Moreover, the plaintiff had suffered no physical harm as a result of the defendant's refusal to rehire him, the defendant's conduct did not evince indifference or reckless disregard to others' safety, and the conduct was not part of a pattern of ongoing behavior toward the defendant's employees in general. 220 Or App at 40. Thus, only two of the *Gore* factors were present: the plaintiff was financially vulnerable and, to a degree, harm resulted from the defendant's "intentional malice, trickery, or deceit." *Id.* In those circumstances, we explained

that, "[t]aken together with the consideration that defendant's wrongdoing was of a purely economic nature, *our analysis leads us to conclude that defendant's conduct was of moderate reprehensibility." Id.* at 241 (emphasis added).[16]

As was the case in *Hamlin* and *Vasquez-Lopez*, the presence of two of the *Gore* factors leads us to conclude that Farmers' actions were of moderate reprehensibility. On the one hand, the harm was financial only, did not involve a risk to health or safety of others, and was not directed at a financially vulnerable class of persons.[17] Moreover, the risk of financial harm (and the actual harm) to any *individual* member of the class was relatively small. In fact, the success of Farmers' scheme was predicated, in part, on the theory that the reductions were too small to be worth litigating. On the other hand, Farmers engaged in a pattern of intentional deceit that would expose a large number of insureds to economic loss. Thus, in our view, in the universe of reprehensibility, the case appears to be somewhat on par with *Hamlin* and *Vasquez-Lopez*, cases that involved conduct that was more malevolent than in this case but that was carried out on a much smaller scale.

As the court explained in *Goddard*, the first guidepost "does not generate numerical answers at all, because the

___

[16] After *Hamlin*, we decided *Lithia Motors, Inc. v. Yovan*, 226 Or App 572, 204 P3d 120 (2009), a case in which the trial court reduced an award of punitive damages from $100,000 to $2,000. In that case, a car dealership undertook efforts to repossess a vehicle that it no longer had a right to possess, thereby violating Oregon's Unlawful Debt Collection Practices Act. We affirmed by an equally divided court in an en banc decision. Five members of this court agreed that the "reprehensibility of plaintiff's conduct, while significant, is not egregious." 226 Or App at 585 (Edmonds, J., concurring). Two other judges "agree[d] that plaintiff's conduct is not very reprehensible in the universe of cases in which juries have awarded punitive damages" but nonetheless concluded that "low reprehensibility" could not be used to decrease the amount of punitive damages below a 9:1 ratio to compensatory damages. 226 Or App at 598 (Sercombe, J., dissenting).

[17] Plaintiffs contend that the victims of Farmers' fraud were individuals who were injured in accidents and that, as a result of unpaid medical bills, those particularly vulnerable victims suffered emotional distress as well. Plaintiffs did not seek emotional distress damages in this case, and there is no evidence that Farmers specifically directed its percentile reductions at financially vulnerable individuals. However, even assuming the presence of those additional factors, they would not affect our ultimate conclusion regarding reprehensibility, given the relatively small amounts of money involved with respect to the overwhelming majority of class members.

guidepost itself, and the 'subfactors' that go into it, are all qualitative, not quantitative." 344 Or at 257. Nonetheless, "we may compare the level of reprehensibility exhibited in various cases, and that comparison may lead us to a conclusion that the constitutionally permissible limit in a particular case is 'high' or 'low,' relative to the limit in another case." *Id.* In light of *Hamlin* and *Vasquez-Lopez*, which involved similar degrees of reprehensibility and approved of a punitive damages award four times the respective compensatory damages award, we are not convinced that the first guidepost justifies a nine-to-one ratio in this particular case.

We next consider the punitive damages award in light of the third guidepost—comparable civil and criminal penalties. The third guidepost, like the first, "fails to provide a quantitative measuring stick." *Goddard*, 344 Or at 257. The Oregon Supreme Court has explained that comparable sanctions can "be used as a basis for comparing one punitive damages award to another, and not as a direct predictor of the constitutional limits of an individual punitive damages award." *Id.* That is, the guidepost may militate against a significant punitive damages award if the state's comparable sanctions are mild or trivial, whereas the guidepost will support a more significant punitive damages award when the state's comparable sanctions are severe. *Id.*

Here, plaintiffs argue that the Oregon Insurance Code allows for a penalty as high as $10,000 for *each* offense. ORS 731.988. In light of the number of class members and violations at issue (more than 7,000), plaintiffs assert that the "[a]ggregate penalties for Farmers' conduct could reach as much as $70 million, nine times what the jury awarded here." Farmers responds that plaintiffs have neither claimed nor provided any evidence that the Oregon Department of Consumer and Business Services would actually impose any fine for an insurer's reduction of PIP payments based on an eightieth or ninetieth percentile review.

Plaintiffs' argument—that ORS 731.988 provides a direct predictor of a permissible punitive damages award—fails under *Goddard*. 344 Or at 257 ("[T]he Court must have intended that a pertinent civil sanction be used as a basis for comparing one punitive damages award to another, *and not*

*as a direct predictor of the constitutional limits of an individual punitive damages award.*" (Emphasis added.)). However, the relatively high civil penalties for Insurance Code violations do militate in favor of a more significant punitive damages award, toward the higher end of the presumptive limit, but not an award that is nine times plaintiffs' actual or potential harm.

Based on the foregoing review, we conclude that a punitive damages award of $8 million violates Farmers' due process rights on the facts of this case. Our remaining task is to determine the highest constitutional amount of punitive damages that plaintiffs can recover. As our discussion above suggests, under the second guidepost, we begin with the presumption that an award greater than four times plaintiffs' actual and potential harm would violate due process. Under the first guidepost, we have concluded that the conduct in this case is moderately but not severely reprehensible. That guidepost suggests that a permissible award would be somewhere near the highest presumptive ratio of four to one, but certainly not in excess of it. Under the third guidepost, as previously discussed, the significance of comparable sanctions also suggests that a higher punitive damages award is justified—again, something that approaches the presumptive ratio but does not exceed it. Thus, all three guideposts suggest that four to one is the proper ratio of punitive damages to actual or potential harm in this case.

For that reason, in light of the scope and nature of Farmers' conduct, the number of persons affected, and the comparable civil penalties that inform our analysis, we conclude that a punitive damages award that is four times plaintiffs' actual or potential harm is all that due process will bear. Accordingly, we vacate the judgment with instructions to grant Farmers' motion for a new trial limited to punitive damages, unless plaintiffs agree to remittitur of punitive damages to four times their compensatory damages and prejudgment interest.

G. *Eighth assignment of error*

In its eighth assignment of error, Farmers challenges the trial court's award of attorney fees to plaintiffs. Farmers contends that any attorney fee award to plaintiffs is

barred by 1999 amendments to ORS 742.061, and, even assuming that plaintiffs were entitled to attorney fees under that statute, the amount awarded in this case—approximately $2.8 million—is *per se* excessive in light of the damages awarded on the fee-generating claims for breach of the insurance policy.

In their breach of contract claim, plaintiffs' alleged that "[t]he plaintiff class representative has filed proof of loss with [Farmers] for medical and hospital expenses more than six months prior to the filing of this action, and, accordingly, class representative is entitled to reasonable attorney fees pursuant to ORS 742.061." At the time that the class representative filed his proof of loss and, later, when plaintiffs initiated this action, ORS 742.061 (1997) provided, in part:

> "If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon."

In 1999, the legislature amended that statute and added an exception that applied to actions to recover PIP benefits. That exception provides that the statutory entitlement to attorney fees

> "does not apply to actions to recover personal injury protection benefits if, in writing, not later than six months from the date proof of loss is filed with the insurer:
>
> "(a) The insurer has accepted coverage and the only issue is the amount of benefits due the insured; and
>
> "(b) The insurer has consented to submit the case to binding arbitration."

Or Laws 1999, ch 790, § 1.

The question in this case is whether that amendment, which became effective on October 23, 1999, applies retroactively. That is, does the statute apply to cut off the right to attorney fees in cases in which proof of loss, the insurer's acceptance of coverage, its offer to arbitrate, and the filing of the complaint all predated the effective date of the

statute? Although the text of the statute is silent on that issue, the legislative history of the 1999 amendments provides some guidance. That history indicates that the amendments were intended to eliminate a potential incentive to litigate rather than arbitrate PIP claims. *See, e.g.*, Audio Recording, Senate Floor Debate, SB 504, May 28, 1999, at 1:02 (statement of Sen Neil Bryant), http://www.leg.state.or.us/listn/archive/archive.1999s/SENATE-199905280953.ram. Considering that the amendments were intended to influence the insured's decision to litigate rather than arbitrate—specifically, to deter litigation—it is not apparent to us that the legislature would have intended the amendments to apply retroactively to circumstances like these, where plaintiffs' initial decision to litigate rather than arbitrate was made well *before* those amendments took effect.

Moreover, as a general matter, courts "assume that the legislature intends its amendments to existing legislation to apply prospectively unless the legislature signals an intention to apply an amendment retrospectively." *Black v. Arizala*, 337 Or 250, 271, 95 P3d 1109 (2004). Similarly, the Supreme Court has "ordinarily decline[d] to construe a legislative amendment to have a retrospective effect if to do so would 'impair existing rights, create new obligations or impose additional duties with respect to past transactions.' " *Id.* (citations omitted). In this case, ORS 742.061 (1997) was the source of plaintiffs' right to attorney fees. Retroactive application of the 1999 amendments to that statute would impair that right by giving a different legal effect to the parties' past actions. *Cf. Robert Camel Contracting, Inc. v. Krautscheid*, 205 Or App 498, 502, 134 P3d 1065 (2006) (concluding that ORS 20.077 was merely procedural, and therefore retroactive in effect, because it "neither offers nor alters any rights; it does not provide for a remedy in the form of costs or otherwise, unless the underlying contract or statute so provides"). In the absence of some indication that the legislature intended to retroactively eliminate the plaintiffs' ability to recover attorney fees, "we adhere to our usual assumption that the legislature intended a prospective application of its amendment[s]." *Black*, 337 Or at 271.

Farmers' final argument is that the attorney fee award is unreasonable in this case given the "modest size of the policy-based award" to class members. Farmers does not

"dispute the credentials or tenacity" of plaintiffs' counsel; rather, in its view, "an attorney fee award that so far exceeds the clients' relevant recovery (a factor of more than 20:1) is excessive by any measure." By Farmers' calculus, plaintiffs' statutory attorney fee award "should be about $50,000."

In effect, Farmers asks us to hold that an attorney fee award becomes unreasonable as a matter of law when it exceeds a plaintiff's recovery by a certain amount. We are not aware of any authority for that proposition, and Farmers cites none.[18] To the contrary, ORS 20.075(2) sets forth a list of factors that courts "shall consider" in determining the amount of fees to award when such an award is authorized by statute. Although one of those factors is the "amount involved in the controversy and the results obtained," that is only one of many factors. ORS 20.075(2). To elevate it as Farmers would have us do—thereby capping the amount of statutory attorney fees that can be recovered in cases like this—would seriously undermine the ability of injured plaintiffs to obtain any redress in small dollar cases. In the absence of any source of law for Farmers' proposition, we decline to adopt it.[19]

Judgment and supplemental judgment vacated with instructions to grant Farmers' motion for new trial limited to punitive damages, unless plaintiffs agree to remittitur of punitive damages to four times their compensatory damages and prejudgment interest; otherwise affirmed.

---

[18] Farmers asserts that *Thelin v. Taylor*, 248 Or 149, 151, 432 P2d 791 (1967), is instructive as a case where the Supreme Court "has said that a fee-to-recovery ratio [of] 25 percent is 'within reason.'" The court's entire discussion of the attorney fee issue in that case is three sentences: "The trial court awarded $200 as an attorneys' fee for the services of the Chapman's attorneys. The Chapmans cross-appealed contending this is not a reasonable sum. In view of the amount recovered, $875, and the time spent in trial, we find the trial court's award was within reason." We are not persuaded that *Thelin* bears on our analysis.

[19] Although Farmers achieved a substantial modification of the judgment on appeal, we nonetheless designate plaintiff as the prevailing party in this case. *See Hamlin*, 227 Or App at 170-71 (plaintiff who successfully defended entitlement to maximum constitutionally permissible punitive damages award was, under the circumstances, the prevailing party on appeal).